BISENIUS, Appellant, v. KARNS, Administrator, Division of Motor Vehicles, Respondent.

*No. 157. Argued February 5, 1969.—Decided March 7, 1969.*
(Also reported in 165 N. W. 2d 377.)

44

For the appellant there was a brief and oral argument by *S. A. Schapiro* of Milwaukee.

For the respondent the cause was argued by *Albert O. Harriman,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

ROBERT W. HANSEN, J. Under attack are the three Wisconsin statutes that require motorcycle operators to (1) wear protection for their eyes; [1] (2) equip their

[1] "Sec. 347.485 (2) No person shall operate a motor-driven cycle on any highway unless such person is wearing eye protection as follows: (a) protective face shield attached to the headgear, or (b) glasses or (c) goggles. If the vehicle is equipped with a windshield which rises a minimum of 15 inches above the handlebar, the use of other eye protective devices is not mandatory. This subsection shall not apply to persons operating a motor-driven cycle in a parade sanctioned by the local municipality."

motorcycles with handlebars that rise no more than 15 inches above the driver's seat;[2] (3) wear protective headgear.[3]

*The public policy.*

We do not deal here with the wisdom or lack of wisdom of these three legislative enactments. The legislative history of these laws, in this state and others, demonstrates that they have dedicated proponents and equally dedicated opponents. The question before us is not what a legislature should do, but what the legislature can do. As has been said:

"Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation . . . ."[4]

In reviewing statutes such as these, we begin with a strong presumption of their validity.[5] We are not to sit in judgment on the merits of such legislation. If the statutes here challenged do not contravene significant constitutional or inherent rights of individuals, if the classification on which they are based is reasonable, if they are within the scope of the police powers of the state, if they are appropriately related to a proper purpose of such police power, the three statutes are not to be invalidated by the judicial arm of government. In-

---

[2] "Sec. 347.486 (1) It is illegal to operate a motor-driven cycle where the handlebars rise more than 15 inches above the lowest point of top of the driver's seat when the seat is occupied."

[3] "Sec. 347.485 (1) (a) No person shall operate or ride upon a motor-driven cycle on any highway unless such person is wearing protective headgear of a type and in the manner approved by the commissioner."

[4] *Berman v. Parker* (1954), 348 U. S. 26, 32, 75 Sup. Ct. 98, 99 L. Ed. 27.

[5] *Gottlieb v. Milwaukee* (1967), 33 Wis. 2d 408, 410, 147 N. W. 2d 633.

deed, the laws are to be upheld by the courts if it is at all possible so to do.

*The two issues.*

This is no shotgun blast type of attack, raising all possible challenges. No issue is raised as to the police power right of the state to control highway safety.[6] No challenge is made to the right to regulate motor-driven cycles as a separate class of vehicles.[7] The relatedness of the legislative enactments appears to be conceded in diminishing the serious consequences, but not in decreasing the incidence of highway accidents involving motorcycle drivers.[8] Two basic challenges are made to the validity of the three laws involved: (1) That they protect the motorcycle driver or rider only against himself, and are, therefore, outside the scope of the police power authority of the state; and (2) that they transgress constitutional or inherent rights of the plaintiff without corresponding benefit accruing to the general welfare. Both contentions rest upon the appellant's interpretation of the three statutes as doing no more than protecting cycle drivers and riders from the consequences of their own actions.

*Protection against self?*

Is the sole purpose, effect and result of these motorcycle safety requirements to protect the cyclists, riders or both against themselves? Can we say that they con-

---

[6] "As a concession at the outset, appellant admits that the state has the power to control and regulate highways and motor vehicles as an integral part of the police power." (Brief of Appellant, p. 4.)

[7] "Appellant also admits that there is a concern over the motorcycle injury rate . . . ." (Brief of Appellant, p. 4.)

[8] "Appellant . . . further admits that the legislation concerning helmets and eye protection, although not diminishing the actual rate of accidents, will in some cases diminish the severity of the accident upon the victim, himself." (Brief of Appellant, p. 4.)

cern or benefit in no way other persons, particularly other users of the public highways?

As to sec. 347.485 (2), Stats., requiring operators of motor-driven cycles on any highway to wear glasses, goggles or face shield, unless the vehicle is equipped with a high enough windshield, the challenge fails. Requiring protection for the eyes is clearly related to the accident-causing possibility of dust, dirt, pebbles, even rain or snow, coming in contact with the unshielded eyes of a motorcycle driver. This safeguard against attention being distracted or vision being affected is clearly related to the concerns and interests of other users of the highway. If we were dealing with the cowboy on his horse in the days of the unfenced prairies, the answer might be different but not in an era of high-speed vehicles and heavily traveled highways.

As to sec. 347.486, Stats., regulating the position of the handlebars, the relatedness of the requirement to other users of the highway is likewise evident. The prohibition of tilted or elevated handlebars which lift hands, wrists and arms skyward is related to the necessity of having a motor-driven vehicle under proper management and control. In the split-second decisions that high-speed driving calls for, such full control is related to preventing accidents and to the well-being of other users of the highway. Once again, in horse-and-buggy days, how high one held the reins might not concern others. Fast driving and heavy traffic have changed all that.

As to sec. 347.485, Stats., requiring protective headgear for motorcyclists, the question is much closer. The very term, "protective headgear" implies protection of the head of the wearer. It must be conceded that this particular statute is intended primarily to diminish the severity of the accident upon the victim, himself. But can we say that such safety requirement does not affect or concern at all other users of the public highway?

If the picture that flashes to mind is that of a solitary cyclist on a deserted country road losing control and hitting, an affirmative answer seems plausible. But not all highways are deserted these days; in fact, few are. If the loss of cyclist control were to occur on a well-traveled highway, the separation between consequence and incidence is less sharp. Anything that might cause a driver to lose control may well tragically affect another driver. If the loss of cyclist control occurs on a crowded freeway with its fast-moving traffic, the veering of a cyclist from his path of travel may pile up a half-dozen vehicles.

So, as to the helmet requirement law, one question that arises is whether the presence of a protective helmet would, in some cases and under some circumstances, make less likely the diverting of attention or loss of control of the cycle by its driver.[9]

It cannot be disputed that the driver of a motorcycle is somewhat more exposed to flying objects than someone operating an enclosed vehicle.[10]

The wheels of vehicles traveling at high speeds can kick up or toss through the air pebbles or even stones of some size. Should such flying objects hit a cycle

[9] We do not deal, except parenthetically, with the relationship of wearing safety helmets to visibility. Nearly all safety helmets come in bright colors—yellow, red, white, etc.—that contrast with highway backgrounds. Particularly under conditions of dusk, fog or rain, this factor can make motor-driven cycles and their drivers more easily noticed by oncoming drivers of other vehicles. Such increased visibility would appear to be an accident-preventing factor that aids and concerns other users of the public highways. However, since this aspect of the case was not referred to in the briefs or arguments on appeal, we do not rely upon it here.

[10] "The operator of a motorcycle has considerably less body protection than operators of enclosed vehicles and is more susceptible to be injured and cause other injuries. Thus, there is a reasonable basis for the requirement of headgear to motorcycle drivers as opposed to such requirements for automobile drivers or golf cart operators . . . ." *Everhardt v. New Orleans* (La. 1968), 217 So. 2d 400, 403.

driver alongside the head, the possibility of distraction or even temporary loss of control seems to us evident.[11] The possibility of bees, wasps or even hard-shelled beetles flying into the head of cycle drivers is rather remote,[12] but windblown leaves or branches hitting against the bareheaded driver might well be at least a distraction.[13] One court has termed the argument justifying the helmet law because it protects against flying objects a ". . . strained effort to justify what is admittedly wholesome legislation"[14] adding the suggestion that "If the purpose truly were to deflect flying objects rather than to reduce cranial injuries, a windshield requirement imposed on the manufacturer would bear a reasonable relationship to the objective . . . ."[15] It well might, but choosing between available alternatives in promoting

[11] "The court takes judicial notice of certain dangers inherent in the operation of motorcycles as compared to that of automobiles. The danger of flying stones or other objects from the wheels of moving vehicles is a real one. A blow on the head of a cyclist not only could endanger himself, but be the cause of injury or death to other users of the public highways. To prevent such possible occurrences is a valid objective for legislative action under the general police power of the State." *People v. Schmidt* (1967), 54 Misc. 2d 702, 703, 283 N. Y. Supp. 2d 290, 292.

[12] However, that possibility moved a New York trial court to say the following: "The old joke about the happy motorcyclist—'the one with the bugs on his teeth'—is not too funny when one hears or reads about instances where cyclists have been hit with hard-shelled beetles or bees and have lost control of their bikes, causing damage and injuries to others." *People v. Bielmeyer* (1967), 54 Misc. 2d 466, 469, 282 N. Y. Supp. 2d 797, 800.

[13] "It does not tax the intellect to comprehend that loose stones on the highway kicked up by passing vehicles, or fallen objects such as windblown tree branches, against which the operator of a closed vehicle has some protection, could so affect the operator of a motorcycle as to cause him momentarily to lose control and thus become a menace to other vehicles on the highway." *State ex rel. Colvin v. Lombardi* (R. I. 1968), 241 Atl. 2d 625.

[14] *American Motorcycle Asso. v. Davids* (1968), 11 Mich. App. 351, 158 N. W. 2d 72.

[15] *Id.* at page 75.

highway safety is for the legislature, not for the courts. If requiring helmets is a protection against motorcycle drivers being hit and distracted by flying objects, such requirement need not be the only, or even the best way to accomplish the purpose of preventing such distraction to make it a proper exercise of the police power function.

Over and above the interest the state has in protecting other users of the highways from the danger of involvement in an accident, we further hold that other users of the highway have a definite and legitimate interest in seriousness of the consequences of accidents as well as in the frequency of such mishaps. Testimony in this record, not in dispute, establishes that a serious factor contributing to death and injury in motorcycle accidents is the absence of protective equipment such as helmets and goggles. In the record is the result of an Australian survey concluding that when a helmet is worn, the risk of fatality to a motorcyclist in an accident is reduced to about one third of what the risk would be without a helmet. Are these statistics of concern only to the driver or rider whose life may be lost? Of course not. Certainly all users of a highway have a legitimate concern in not being involved in an accident at all. They also have, and are entitled to have, a definite interest in how serious are the consequences, not only to themselves but to others, of any accident in which they may become involved. Promoting highway safety is not to be limited to the prevention of accidents alone. It can include efforts to reduce the serious consequences of accidents. There is a difference between a fender-bender and an accident causing permanent injuries or death— a difference to the victim, to other drivers involved in the accident and to the community. If not, there would be no reason for requiring automobiles to be equipped with bumpers. They do not help avoid impacts, but they do cushion impacts and lessen the consequences of impact. In a comparative negligence state, with heavy responsibilities as to lookout and control placed upon

all vehicle operators, the very real possibility of being held at least partially responsible for an accident gives every user an interest, on other than humanitarian concerns, in provisions that lessen the probabilities of death or disability as an outcome of a highway encounter. At least they are affected, and that is the test. Therefore, the police power of the state may be exercised to minimize the consequences of collisions and accidents as well as to decrease the number of such collisions and accidents.

*Outside the scope.*

We have held that the helmet requirement statute does affect the interests of other users of public highways. So we do not reach the question of whether it is invariably and inescapably fatal to a public safety statute that it seeks only to protect persons against the consequences of their own actions. However, if this were indeed the test to be used in determining the validity of a police power statute, a considerable number of statutes here and elsewhere would become suspect, including laws requiring hunters to wear brightly colored jackets, prohibiting riders upon motor-driven cycles from attaching same to any other vehicle upon a highway, prohibiting persons other than employees from riding upon any part of a vehicle not designed for use of passengers, requiring boats to be equipped with life preservers, prohibiting aerial performances without a net, requiring persons to wear life preservers while riding on water skiis, requiring tunnel workers to wear protective helmets and other types of industrial employees to wear protective goggles. For our purpose here, it is enough to observe that the concept that it is my neck and I have a right to risk it when and where I please has had some limitations placed upon its application.

*Right to self-harm?*

The contention of appellant that the actor, as long as harm to others is not threatened or caused, may incur

whatever risks he desires free from state control deserves closer analysis. There is an adventuresome appeal to the claim. It conjures up a picture of an outdoorsman piloting his canoe through dangerous rapids or scaling a lofty mountain peak. However, if it also conjures up a vision of a rejected suitor jumping from a building or driving over a cliff, it goes beyond the limits of constitutionally protected liberties. It is true that the successful suicide is no longer within the reach of the law, but it does not follow that self-destruction is a legally protected right of individuals. Suicide, meaning the voluntary and intentional taking of one's own life by a sane person, was a felony at common law, as it still is in some jurisdictions. It is a "grave public wrong" [16] as illustrated by statutes determining the criminality of aiders and abettors, persons joining in suicide pacts, and attempts to commit suicide. [17]

There is in the law no sanction for self-destruction, and certainly there is no right on the part of anyone to use public highways for risking or courting or seeking such self-destruction. Protection of the safety of all users of the highway even against the consequences of their own actions is a legitimate use of the police powers of the state. [18]

*Constitutional question.*

There remains the contention that the balance of the personal liberty of the individual and the interest of the state as exercised by its police power has been un-

[16] *Stiles v. Clifton Springs Sanitarium Co.* (D. C. N. Y. 1947), 74 Fed. Supp. 907.

[17] *See* 83 C. J. S., *Suicide*, p. 783, sec. 2.

[18] "Protection of the safety of persons being one of the principal uses of the police power of the states, measures designed to protect and further the safety of the individual are proper exercises of the power." 16 Am. Jur. 2d, *Constitutional Law*, p. 605, sec. 308.

constitutionally imbalanced by enactment of these safety statutes.

We do not deal here with a present-day equivalent of the edict of Julius Caesar in about 46 B. C. banning all wheeled vehicles from the streets of Rome during daylight hours. What is the personal liberty here involved? It can only be the right of the cyclist to mount his cycle and drive off without donning a safety or crash helmet. We do not deem this an inconsequential right. The old Sioux Indian maxim went "Judge no man until you have walked in his moccasins for three moons." To the cycling enthusiast the freedom to drive or ride his cycle, hatless or helmetless, is meaningful. There is something of an analogy in the situation when building workers and highway patrol officers were required to wear crash-type helmets as a protection against injury. The initial reaction was not uniformly favorable. Resistance to wearing a prescribed safety helmet is an understandable human reaction. Perhaps almost all of us have a secret admiration for the pint-sized guard on a major football team who, years ago, went out on the gridiron, sans helmet, to face giant-sized opponents. He might not be permitted or perhaps want to do so nowadays.

However, we are not faced with the question of whether football players, building workers, police officers or motorcycle drivers ought to be required to wear helmets. We face here the question of whether the constitution, federal or state, prohibits the legislature from requiring protective helmets to be worn by motorcycle drivers (or eye protection and untilted handlebars insisted upon).

It is probably true that every exercise of the police power of the state involves some measure of interference with personal liberties of citizens. It has been said that "To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, . . . require such in-

terference; and second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." [19] It has been suggested that this leaves to the courts ". . . essentially a balancing test between the rights infringed and the benefits to the general welfare with the balance strongly weighed in favor of the general welfare at the start." [20]

We are uneasy with this balancing and weighing concept of the judicial role in testing the constitutionality of a police power statute. There is too much of a temptation to a putting of a judicial thumb on the scales with judges substituting their own evaluation of alternatives for that of the legislature. We would hold that, once within the area of proper exercise of police power, it is for the legislature to determine what regulations, restraints or prohibitions are reasonably required to protect the public safety and only the abrogation of a basic and substantial individual liberty would justify judicial intervention to set aside the legislative enactments. [21]

Appellant's counsel argues that the basic liberty abrogated is the right of the individual to be let alone by government. This liberty was, years ago, capsulized by a great jurist, LOUIS DEMNITZ BRANDEIS, in these words:

"The makers of our Constitution . . . sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." [22]

---

[19] *Lawton v. Steele* (1894), 152 U. S. 133, 14 Sup. Ct. 499, 38 L. Ed. 385.

[20] Note, 1969 Wis. L. Rev. 320.

[21] "It is for the legislature to determine the justice, wisdom, policy, necessity, or expediency of a law which is within its powers to enact, and such questions are not open to inquiry by the courts . . . ." 16 C. J. S., *Constitutional Law*, pp. 775, 776, sec. 154.

[22] *Olmstead v. United States* (1928), 277 U. S. 438, 478, 48 Sup. Ct. 564, 72 L. Ed. 944, dissenting opinion by BRANDEIS, J.

However, Mr. Justice BRANDEIS hardly intended that such right to be let alone would include the right to camp on a cloverleaf or do one's thing on an expressway. There is no place where any such right to be let alone would be less assertible than on a modern highway with cars, trucks, busses and cycles whizzing by at sixty or seventy miles an hour. When one ventures onto such a highway, he must be expected and required to conform to public safety regulations and controls, including some that would neither have been necessary nor reasonable in the era of horse-drawn vehicles.

The concept of public safety is an evolutionary, not a fixed or static proposition. The range of permissible public action in the area of highway transportation has been enlarged, not by the courts, but by the changes that have come in the field of public and private transportation.

We conclude, in the words of the Massachusetts court (upholding a similar statute requiring "every person operating or riding a motorcycle to wear protective headgear conforming with certain minimum standards") that "It lies within the power of the Legislature to adopt reasonable measures for the promotion of safety upon public ways in the interests of motorcyclists and others who may use them. . . The act of the Legislature bears a real and substantial relation to the public health and general welfare and is thus a valid exercise of the police power . . . 'the legislation is reasonable, applies to all equally, and is directly related to highway safety.'" [23]
We agree.

*By the Court.*—Judgment affirmed.

---

[23] *Commonwealth v. Howie* (Mass. 1968), 238 N. E. 2d 373. (Certiorari denied Dec. 16, 1968.) 393 U. S. 999, 89 Sup. Ct. 485, 21 L. Ed. 2d 464.