**STATE of Missouri, Appellant,**

**v.**

**William Thomas DARRAH, Respondent.**

No. 54389.

Supreme Court of Missouri,
Division No. 2.

Nov. 10, 1969.

John C. Danforth, Atty. Gen., Walter W. Nowotny, Jr., Asst. Atty. Gen., Jefferson City, for appellant.

James T. Buckley, Sedalia, for respondent.

BARRETT, Commissioner.

This appeal involves the constitutionality of that part of the motor vehicle registra-tion and licensing law relating to the operation of motor vehicles, particularly subdivision 3 of Section 302.020 making it unlawful to operate a motorcycle without wearing protective headgear:

"*Every person operating* or riding as a passenger on *any motorcycle,* as defined in Section 301.010, RSMo, upon any highway of this state *shall wear protective headgear* at all times the vehicle is in motion." (RSMo Supp. Sec. 302.-020, subd. 3.)

The question arose and is presented in these circumstances: The prosecuting attorney filed an information charging that the respondent, Darrah, "did wilfully and unlawfully operate a 1966 Triumph motorcycle upon a public highway at or near the intersection of Main Street and Grand Avenue in Sedalia, Pettis County, Missouri, without wearing approved protective headgear." Challenging the constitutionality of the act as an infringement of his rights under the Ninth and Fourteenth Amendments of the Constitution of the United States and the due process clause of the state constitution, Art. 1, Sec. 10, V.A.M.S., Darrah filed a motion to dismiss the information. The circuit court in a rather full memorandum judgment found the act unconstitutional and therefore discharged the respondent. In so doing the court relied upon and quoted at length from two opinions, American Motorcycle Association v. Davids, Mich. App., 158 N.W.2d 72, and Everhardt v. City of New Orleans, La.App., 208 So.2d 423. The court's judgment was entered eight days before the Supreme Court of Louisiana, in Everhardt v. New Orleans, 217 So.2d 400, overruled or reversed its Court of Appeals. And further in fairness to the courts, it should be noted that except for Rhode Island and two New York decisions the court did not have the benefit of a large number of decisions involving motorcycle headgear statutes. As to any relevant facts, the court observed that while neither party offered any evidence "It is admitted that the defendant violated the statute in question." Pertinent also the

court noted that "There is no evidence in the record to show any evil against which the statute is directed or how it will promote the public health, safety, morals or general welfare of the community." In conclusion, in declaring the statute void, the court observed that "There is no evidence in this record that there is any situation existing which would be helped by the statute or that the safety of the general public would be favorably affected by the wearing of helmets by motorcycle drivers." Upon entry of the judgment of unconstitutionality and discharge and therefore a judgment that the information failed to charge Darrah with an offense the state has appealed. RSMo 1959, §§ 547.200, 547.-210, V.A.M.S.; Cr.Rule 28.04, V.A.M.R.; State v. Terrell, Mo., 303 S.W.2d 26.

As the court observed, there is no evidence and hence no proven fact or established statistical data directly relating to the precise evil to be remedied by the headgear law, neither is there any similar data in this record as to precisely how the "general public would be favorably affected." The same suggestion has been made in law school notes to cases, particularly in connection with the Michigan Court of Appeals decision (67 Mich.L.R. 360, an apology and defense of the opinion). And so it is urged that there is no sound or factual basis for the observations of several courts upholding the statutes that motorcycle operators are exposed to the hazard of being stunned by flying stones or pebbles cast by other high-speed vehicles thereby being temporarily distracted and losing control as in Bisenius v. Karns, 42 Wis.2d 42, 165 N.W.2d 377, and People v. Schmidt, 54 Misc.2d 702, 283 N.Y.S.2d 290. In this connection it has been suggested that there has been no "identification of precisely what constitutes the public evil to be remedied" (30 Ohio S.L.J. 355, 359) and therefore it is argued that the statutes are designed solely for the protection of the motorcycle operator without relationship to the safety of the general public and for that reason are unconstitutional. In this pos-

ture it is asserted that the views of those upholding the statute are based upon an unwarranted "presumption of constitutionality" of legislation (30 Ohio S.L.J. 1. c. 356) or a sort of "judicial notice of what 'one hears or reads about'" and thus the additional question is raised whether and upon whom, the state or the challenger, there is a burden of proof as to the factual foundation of constitutionality. 67 Mich.L.R. 359, 369–371. Also the "analogical" approach, suicide laws, automobile seat-belt legislation, Sunday laws etc., has been attacked. 30 Ohio S.L.J. 1. c. 372. There are two excellent critical notes on the Michigan opinion in 82 Har.L.R. 469 and 13 St.L.J. 339. Contrary to the other notes both the "public safety" and "public burden" theories are approved. The Harvard note points out that the court "virtually ignored the harms to society generally which follow the loss or injury of an individual."

In many respects these critical views are contrary even to the opinions of the courts declaring headgear legislation unconstitutional. The leading case of this view is now People v. Fries, Ill., 250 N.E.2d 149–150, but even there the court said, "The classification of motorcyclists separately from operators of other vehicles has a reasonable basis. The differences are evident and need no elucidation at this point." While the court found that the "manifest function" of the headgear requirement was solely to safeguard the person wearing it the court said, "Such a laudable purpose, however, cannot justify the regulation of what is essentially a matter of personal safety." (250 N.E.2d 1. c. 151.) Citing in a footnote statistics of a mortality rate of 11.5 for 10,000 registrations of motorcycles as compared with 5.2 fatalities per 10,000 for all other vehicles the Michigan court nevertheless rejected the reasoning in favor of the legislation as "obviously a strained effort to justify what is admittedly wholesome legislation." (158 N.W.2d 1. c. 75.) And as to judicial knowledge and incontrovertible, significant facts concerning motorcycles and their operators, no

one has challenged the accuracy of this statement by the Supreme Court of North Carolina: "Motorcycle operators occupy positions of extreme exposure which are not shared by automobile and truck drivers. The latter operate in closed vehicles protected by steel and shatterproof glass." State v. Anderson, 275 N.C. 168, 174, 166 S.E.2d 49, 51–53. Critics of the legislation say that the argument of danger to the operator from flying objects supports their contention for if this is the legislative evil windshields afford greater protection than crash helmets.

In support of its contention that the headgear statute was designed solely for the protection of the operators and was an attempt to regulate what clothes or articles of adornment they might wear, the American Motorcycle Association relied on a dictum of John Stuart Mill to demonstrate an infringement of individual rights: "the individual is not accountable to society for his actions, insofar as these concern the interests of no person but himself." The Michigan court tacitly approved the maxim as a basis for striking down the legislation. (158 N.W.2d l. c. 73.) But as to the vehicle itself, as an object apart, it has been pointed out that there is an inherent danger in the motorcycle's basic design, "particularly the fact that it must be balanced on two wheels" which "accounts for its peculiar susceptibility to loss of control" and so requires the utmost vigilance of its operator. 13 St.L.J. l. c. 339. "Physicists do not yet know the exact principle which keeps a cycle erect and moving. The successful and enjoyable operation of a motorcycle can only be had when there is a true 'man-machine team.' The 'two' are more truly 'one' than with any other means of conveyance." People v. Bielmeyer, 54 Misc.2d 466, 282 N.Y.S.2d 797, 800. One court has put these matters aside on the ground that they concerned the efficaciousness of helmets and did not affect the constitutionality of the statutes. State v. Mele, 103 N.J. Super. 353, 247 A.2d 176. In any event "Motor vehicles have become of such gen-

eral use and form so large a part of the daily lives and experiences of the people that judicial knowledge may be taken of those prominent facts with respect to them or their operation which are a part of the common knowledge of every person of ordinary understanding and observation." 31A C.J.S. Evidence § 81, p. 101.

But as indicated, these matters relate to the motorcycle as a thing apart or to its operator individually while there are certain other incontrovertible factors bearing directly on motor vehicle legislation in general: "1966 was a year of considerable agitation over the rising slaughter on public highways." 30 Ohio S.L.J. 1. c. 357. In explanation of the Highway Safety Act of 1966, the first sentence of C.C.H. Reports, p. 9 (Products Liability) reads "In 1965, 49,000 persons lost their lives in highway accidents; 1,500,000 people suffered disabling injuries; another 1,500,000 individuals suffered nondisabling injuries; and * * * the economc costs of highway accidents during the year (1965) aggregated $8.5 billion." These and similar statistics have been noted in several of the cases, and a New York court said, "In fact, motorcycle accidents increased by 105% in 1965 as compared to 1964, while the total registration of these vehicles increased by 83%. Fatalities increased by 63.6% and personal injury accidents by 100%. A summary of the Department (Motor Vehicles) statistics indicates that 89.2% of the motorcycle accidents result in injury or death and that almost all fatalities occurring as a result of such accidents involve head injuries. Most of these fatalities could have been avoided, or the severity lessened, by the use of a proper helmet." People v. Carmichael, 56 Misc.2d 388, 288 N.Y.S.2d 931, 935. For these reasons, no doubt, the North Carolina court said, "Death on the highway can no longer be considered as a personal and individual tragedy alone. The mounting carnage has long since reached proportions of a public disaster. Legislation reasonably designed to reduce the toll may for that reason alone be sufficiently imbued with the public interests to meet the

constitutional test required for a valid exercise of the State's police power." State v. Anderson, 3 N.C.App. 124, 1. c. 126, 164 S.E.2d 48, 1. c. 50.

As to motorcycle headgear, it has been said that "harm to the public at large" is not demonstrated by the response that driving on public highways is a "privilege" not a "right." 30 Ohio S.L.J. 1. c. 369. In part this assertion is based on an opinion of the Louisiana Court of Appeals, 208 So. 2d 423, despite the fact that the Supreme Court in reversing that decision said that "driving upon public streets and highways is a privilege and not a right." Everhardt v. City of New Orleans, 253 La. 285, 1. c. 290, 217 So.2d 400, 1. c. 402. And, curiously enough, Missouri adopted this view in 1912 when the first comprehensive highway regulations were adopted and in habeas corpus Kneedler challenged the constitutionality of the penal sections of the law. Even then the court concluded, "Common observation and experience show that unrestricted use of motor vehicles on public streets would be extremely dangerous to life and limb and the property of the public. Their use thus becomes a fit subject for State regulation. *Every person who operates or uses a motor vehicle must be regarded as exercising a privilege and not an unrestricted right.* It being a privilege granted by the Legislature, a person enjoying such privilege must take it subject to all proper restrictions." Ex parte Kneedler, 243 Mo. 632, 641, 147 S.W. 983, 984–985, 40 L.R.A.,N.S., 622. But assuming the general use of highways to be a *right*: "The right of a citizen to travel upon the public highways is a common right, but it is clearly within the State's police power to regulate and control the manner of exercise of that right in the interest of public safety and welfare." State v. Anderson, 3 N.C.App. 1. c. 126, 164 S.E.2d 1. c. 50.

It is in these two connections, the "carnage" from vehicular accidents and the fact that the use of highways is a "privilege" or a limited right, that relevant federal legislation has recently been enacted. The Highway Safety Act of 1966 (23 U.S.C.A.Supp. Ch. 4, §§ 401–403) and the Motor Vehicle Safety Standards Act of 1966 (15 U.S.C.A.Supp. § 1381 et seq.): "Congress hereby declares that the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S. C.A. § 1381. In upholding the constitutionality of its law the Louisiana court noted the fact of this federal legislation, the rules of the National Safety Council and the fact that over thirty states had adopted implementing legislation. Everhardt v. City of New Orleans, 217 So.2d 1. c. 402; State v. Anderson, 3 N.C.App. 124, 164 S.E.2d 1. c. 50–51.

In part the respondent's argument implies if it does not assume that "motorcycles" are not "motor vehicles." There may be some lack of scientific, authoritative data relating solely to motorcycles or motorcyclists. And it is true that motorcycles as such are not mentioned or singled out by name in either the Highway Safety Act or the Motor Vehicle Standards Act. Nevertheless, § 302.020, subd. 3, under attack here, is a part of the general law relating to "Drivers' and Chauffeurs' Licenses" (Ch. 302, RSMo 1959, V.A.M.S.) and by its own terms specifically applies to any "motorcycle as defined in § 301.010." And that section of the statute defines "motor vehicle" as "any self-propelled vehicle not operated exclusively on tracks," and "operator" as "any person who operates or drives a motor vehicle." And most important here a "motorcycle" is "a motor vehicle operated on two wheels." RSMo 1959, § 301.010(13), (15), (18), V.A.M.S. And so even though there may be a shortage of accurate statistical information relating alone to motorcycles, a "motorcycle" is a "motor vehicle" and its "operator" is a "person who operates or drives a motor vehicle."

It may now be noted in passing what the statute, the present record and appeal do not involve as some of the respondent's argument may imply. There is no attempt

here to proscribe either motorcycles or motorcycle operators or to prevent their use of the public highways. The restriction is upon driving motorcycles on highways without "protective headgear at all times the vehicle is in motion." RSMo 1959 Supp. § 302.020, subd. 3. And, in general, there is in fact no issue "as to the police power right of the state to control highway safety," even though the attack on the legislation is somewhat of a "shotgun blast type of attack, raising all possible challenges." Bisenius v. Karns, 42 Wis.2d 1. c. 46, 165 N.W.2d 1. c. 379. And there is no issue here as the Illinois court notes but employs in striking down the statute as to a passenger and the validity of the helmet law as to him and that issue will of necessity await a case compelling a resolution of that problem.

Recently several courts have simply listed the jurisdictions upholding the constitutionality of the headgear statutes and summarily disposed of all attacks by merely saying "the statute bears a real and substantial relationship to highway safety generally and does not constitute an improper exercise of the police power." State v. Krammes, 105 N.J.Super. 345, 252 A.2d 223; People v. Schmidt, 54 Misc.2d 702, 283 N.Y.S.2d 290; Ex parte Smith, Tex. Crim.App., 441 S.W.2d 544; State v. Odegaard, N.D., 165 N.W.2d 677; Commonwealth v. Howie, Mass., 238 N.E.2d 373.

The Wisconsin court, on the other hand, was "uneasy with this balancing and weighing concept of the judicial role in testing the constitutionality of a police power statute." That court was of the view "that, once within the area of proper exercise of police power, it is for the legislature to determine what regulations, restraints or prohibitions are reasonably required to protect the public safety and only the abrogation of a basic and substantial individual liberty would justify judicial intervention to set aside the legislative enactments." Thus the court held that the claimed "right of the individual to

be left alone by government" (the nineteenth century philosophy of John Stuart Mill) would not today "include the right to camp on a cloverleaf or do one's thing on an expressway." It was there pointed out that "The range of permissible public action in the area of highway transportation has been enlarged, not by the courts, but by the changes that have come in the field of public and private transportation." As against the claim, as here, that the statute "only protects the individual wearer," solely for his safety, and infringes his "right, should he desire, to assume whatever risk there may be in the operation of a motorcycle without wearing protective headgear," the court said: "There is in the law no sanction for self-destruction, and certainly there is no right on the part of anyone to use public highways for risking or courting or seeking such self-destruction." Bisenius v. Karns, supra. A Connecticut court had this to say of the individual's right to risk his life or limb: "There is also a weakness in the contention that the state has no power to punish an act which harmed no one but the actor. We are of the opinion that the statute prevents a danger that is antisocial—the inherent danger of injury to others in the operation of a motorcycle." Connecticut v. Burzycki, 37 Law Week 2448, certification for appeal denied, State v. Burzycki, Conn., 252 A.2d 312. Despite Mill's maxim of the individual's unaccountability to society for actions concerning "no person but himself," the Rhode Island court said, "We are not persuaded that the legislature is powerless to prohibit individuals from pursuing a course of conduct which could conceivably result in their becoming public charges." State v. Lombardi, R.I., 241 A.2d 625, 627. And these courts could have added that almost all police-power legislation necessarily restricts individual rights and of course "involves some measure of interference with personal liberties." Bisenius v. Karns, supra; People v. Carmichael, 56 Misc.2d 388, 288 N.Y.S.2d 931.

In considering the basic argument whether headgear statutes were designed solely for the protection of the motorcycle operator and were therefore outside the police power, it has been held "that other users of the highway have a definite and legitimate interest in seriousness of the consequences of accidents as well as in the frequency of such mishaps." Certainly "all users of a highway have a legitimate concern in not being involved in an accident at all." They have a legitimate concern in how serious the consequences may be to themselves and to others "of any accident in which they may become involved." And promoting highway safety is not limited to the prevention of accidents alone: "It can include efforts to reduce the serious consequences of accidents. There is a difference between a fender-bender and an accident causing permanent injuries or death—a difference to the victim, to other drivers involved in the accident and to the community." Bisenius v. Karns, 42 Wis.2d 1. c. 50, 165 N.W. 2d 1. c. 381. The Rhode Island court said that even if the sole legislative motivation was the protection of the operator, nevertheless, "the requirement of protective headgear for the exposed operator bears a reasonable relationship to highway safety generally." State v. Lombardi, 241 A.2d 1. c. 627, and State v. Odegaard, N.D., 165 N.W.2d 677. The Louisiana and New Jersey courts found that the legislation promoted safety upon the highways "in the interest of the motorcyclist as well as all others who may use them," applying to all cyclists alike, and so there was no infringement of equal protection. Everhardt v. City of New Orleans, 217 So.2d 1. c. 403; State v. Mele, supra. And finally on this phase of the controversy the North Carolina court pointed out that legislation to be constitutional need not be referable alone to public safety or to all members of the public, if the headgear requirement "contributes in any real or substantial way to the safety of other travelers, then the regulation is a constitutional exercise of police power." State v. Anderson, 275 N.C. 168, 166 S.E.2d 49, 1. c. 50.

In addition to all these noted considerations and factors, one court in finding headgear legislation within the police power considered, since the advent of motor vehicle financial responsibility laws, the possibility of its lessening the number and severity of injuries "and the consequent reduction in liability insurance premium costs." State v. Anderson, 3 N.C.App., 1. c. 128, 164 S.E.2d 1. c. 51. The same court also noted the fact that up to 1969 over thirty states had adopted headgear legislation and the Supreme Court considered that fact as well as the fact that a large majority of jurisdictions had upheld the constitutionality of the legislation. (166 S.E.2d 52.) And it may be noted that up to now twelve states, counting the equivocal position of New York, have upheld the constitutionality of this and similar statutes against all conceivable attacks while only two jurisdictions, Illinois and Michigan, have rejected them as enacted solely "to safeguard the person wearing it * * * from head injuries. Such a laudable purpose, however, cannot justify the regulation of what is essentially a matter of personal safety" and therefore beyond the police power. People v. Fries, 250 N.E.2d 1. c. 151; American Motorcycle Ass'n. v. Davids, supra.

The respondent's Ninth Amendment argument is shrouded in some obscurity: "Notwithstanding the paucity of authority, the respondent herein submits that if there is any substance to this amendment it must be deemed to embrace the freedom of the individual, to determine what he will do or will not do in aid of his personal well being and personal safety in the context of activities which alone affect him as distinguished from society at large." This or a similar contention has been urged and rejected in other jurisdictions. The Connecticut court noted that the Ninth together with the Third, Fourth and Fifth Amendments creates what has

been called a "zone of privacy" and so it is urged "government power is limited by many unenumerated rights of the people." Nevertheless the court found the purpose of protective headgear statutes to be "a proper subject for legislation." Connecticut v. Burzycki, supra. The Michigan court, relying on the cited case of Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, (relating to contraceptives) appears to equate the Ninth Amendment with Mr. Justice Brandeis' right "to be let alone" (expressed in a dissenting opinion, Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944) and notes it as a factor in striking down the legislation. But even the Illinois court recognized the classification of motorcyclists as reasonable (People v. Fries, supra) and so did the Louisiana court (Everhardt v. New Orleans, supra) and the Wisconsin court in commenting on Mr. Justice Brandeis' dictum in the Olmstead case made the pertinent observation that "There is no place where any such right to be let alone would be less assertable than on a modern highway with cars, trucks, busses and cycles whizzing by at sixty or seventy miles an hour. When one ventures onto such a highway, he must be expected and required to conform to public safety regulations and controls, including some that would neither have been necessary nor reasonable in the era of horse-drawn vehicles." Bisenius v. Karns, 165 N.W.2d l. c. 384.

It is not necessary to summarize and recapitulate, considering all the indicated factors and reasons the Missouri headgear statute as applied to motorcycle drivers or operators bears a real and substantial relationship to highway safety generally and is indeed within the police power of the state and is not unconstitutional for any of the reasons now urged by the respondent. With all deference to the trial judge and to the opinions of the Illinois and Michigan courts, the judgment is reversed and the cause remanded.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.