STATE of Iowa, Appellee,

v.

John HARTOG, Appellant.

No. 88–383.

Supreme Court of Iowa.

May 17, 1989.

Rehearing Denied June 6, 1989.

Christopher J. Tinley of Pogge, Root & Fleming, Council Bluffs, for appellant.

Thomas J. Miller, Atty. Gen., Charles J. Krogmeier, Sp. Asst. Atty. Gen., Mark Hunacek, Asst. Atty. Gen., and E.A. Westfall, County Atty., for appellee.

Considered by McGIVERIN, C.J., and SCHULTZ, CARTER, LAVORATO and NEUMAN, JJ.

LAVORATO, Justice.

At issue here is whether Iowa's mandatory seat belt law is unconstitutional. The trial court held that it was not. We agree and affirm.

## I. *Background Facts and Proceedings.*

During the early morning hours of November 1, 1987, the defendant, John Hartog, was stopped at a roadblock in Carter Lake, Iowa. The roadblock was jointly conducted by the Iowa State Patrol and local and county law enforcement agencies. An officer checked Hartog's car for safety violations and found none. The officer did, however, issue Hartog a citation for failing to use his seat belt as required by Iowa Code section 321.445(2) (1987). The following month, Hartog was issued another seat belt citation.

Hartog was found guilty on both charges in separate trials before a magistrate. Hartog did not dispute the fact that he had not been wearing his seat belt on either occasion. Instead, at the close of the State's case in each trial, he moved to have the citation dismissed and the mandatory seat belt law declared unconstitutional as (1) violating his rights to privacy and equal protection and (2) exceeding the scope of the state's police power under both the federal and Iowa constitutions. The motion was overruled at each trial.

On appeal, the district court affirmed both convictions. Hartog filed separate applications for discretionary review with this court as well as a motion to consolidate the appeals. We granted both applications and the motion.

On appeal here, Hartog has narrowed his state and federal constitutional challenges to two. First, he asserts that section 321.445(2), the seat belt law, violates his right of privacy as guaranteed by the due process clauses of the fourteenth amendment to the United States Constitution and article I, section 9 of the Iowa Constitution. Second, he contends the seat belt law exceeds the state's police power under the due process clauses of both constitutions.

## II. *The Seat Belt Law.*

Iowa's mandatory seat belt law provides in part:

> The driver and front seat occupants of a type of motor vehicle which is subject to registration in Iowa, except a motorcycle or a motorized bicycle, shall each wear a properly adjusted and fastened safety belt or safety harness any time the vehicle is in forward motion on a street or highway in this state except that a child under six years of age shall be secured as required under section 321.446.

Iowa Code § 321.445(2). Section 321.445(2) exempts the following persons from complying with the seat belt provision: (a) the driver or front seat occupants of a motor vehicle not required to be equipped with safety belts under rules adopted by the state department of transportation; (b) the driver or front seat occupants of a motor vehicle who are actively engaged in work that requires frequent exits from and reentries into the vehicle, provided that the vehicle does not exceed twenty-five miles per hour between stops; (c) rural postal drivers at certain points in their deliveries; (d) passengers on a bus; (e) a person possessing a written certification from a physician that the person is unable to wear a seat belt because of physical or medical reasons; and (f) front seat occupants, except the driver, of an authorized emergency vehicle while such occupants are being transported in an emergency. *See* Iowa Code § 321.445(2)(a)–(f). Although not specifically exempted, back seat passengers are not required by section 321.445(2) to wear seat belts.

The driver and front seat passengers may be charged separately for failing to wear a seat belt. *See* Iowa Code § 321.445(3). Evidence of such failure, however, is not admissible or material as evidence in a civil action for damages arising before July 1, 1986. Thereafter, such evidence is admissible to mitigate damages. *See* Iowa Code § 321.445(4)(a), (b).

A violation of section 321.445(2) is subject to a ten-dollar fine but does not subject the violator to the habitual offender provisions of Iowa Code section 321.555. *See* Iowa Code §§ 321.482, 321.555(2), 805.-8(2)(c).

Before proceeding to the constitutional issues raised, we wish to emphasize that our task is not to question the wisdom or necessity of this legislation. Rather, our

task is to determine whether the legislation passes constitutional muster. *See* 2 R.D. Rotunda, J.E. Nowak & J.N. Young, *Constitutional Law: Substance and Procedure* § 14.6, at 14 (1986) (hereinafter cited as Rotunda).

### III. *The Right to Privacy.*

Hartog first contends that Iowa Code section 321.445(2) violates his right to privacy as guaranteed by the due process clauses of the fourteenth amendment to the United States Constitution and article I, section 9 of the Iowa Constitution. In support of his contention, Hartog essentially argues that the statute deprives him of a fundamental right to make a choice pertaining solely to his person and his personal safety. He likens this supposed fundamental right to the fundamental right of a woman to terminate her pregnancy, as recognized in *Roe v. Wade*, 410 U.S. 113, 154, 93 S.Ct. 705, 727, 35 L.Ed.2d 147, 177–78 (1973).

The due process clause of the fourteenth amendment provides that no state shall "deprive any person of life, liberty, or property, without due process." A similar provision is found in article I, section 9 of the Iowa Constitution: "[N]o person shall be deprived of life, liberty, or property, without due process." The due process clauses of the fourteenth amendment and of article I, section 9 of the Iowa Constitution are limited to state action. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45, 50 (1961); *Jensen v. Schreck*, 275 N.W.2d 374, 384 (Iowa 1979). Because of the textual similarity between the two clauses, we often look to federal cases when interpreting the state due process clause. *Gooch v. Iowa Dep't of Transp.*, 398 N.W.2d 845, 848 (Iowa 1987).

Judicial review under the federal due process clause of the fourteenth amendment takes two forms: procedural and substantive. Procedural due process review concerns itself only with the fairness of the process by which a governmental entity applies a law to an individual. Substantive due process review, on the other hand, concerns itself only with whether the law is constitutional. 2 Rotunda, § 14.6, at 12–13. Here we are concerned with the latter.

In determining whether a law is constitutional, we generally apply a standard of review that requires the law to be rationally related to a legitimate goal of government. *See San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16, 33 (1973).

Our standard of review is more stringent, however, if the law limits a "fundamental" right or liberty under the Constitution. In these circumstances, we are more careful in scrutinizing the underlying factual basis for the law. Our review is thus elevated to the level of "strict scrutiny." *See id.*

■ Under the strict scrutiny standard of review, any law that limits a fundamental right must promote a compelling or overriding interest of government. Otherwise, the law is unconstitutional. *Roe v. Wade*, 410 U.S. at 155, 93 S.Ct. at 728, 35 L.Ed.2d at 178.

Clearly, life, liberty, and property are fundamental rights because they have textual recognition in the due process clause. *See Bowers v. Hardwick*, 478 U.S. 186, 191, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140, 146 (1986). The Supreme Court has also recognized fundamental rights implicit or subsumed in the terms "life," "liberty," and "property." *See id.* The right to privacy is one such implied fundamental right. *Bowers*, 478 U.S. at 191, 106 S.Ct. at 2844, 92 L.Ed.2d at 146; *Roe v. Wade*, 410 U.S. at 152, 93 S.Ct. at 726, 35 L.Ed.2d at 176 ("only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty' are included in this guarantee of personal privacy"). It is subsumed or implicit in the term "liberty." *See* 2 Rotunda, § 17.4, at 222.

■ The right to privacy in this context simply means the freedom of choice to engage in certain activities. *See* 2 Rotunda § 17.4, at 222. The Supreme Court has, however, defined those activities to include only child rearing and education, family relationships, procreation, marriage, con-

traception, and abortion. *Bowers*, 478 U.S. at 190, 106 S.Ct. at 2843, 92 L.Ed.2d at 145–46.

Moreover, the Court has expressed a resistance to the idea of expanding the right of privacy beyond these activities. *Id.* at 195, 106 S.Ct. at 2846, 92 L.Ed.2d at 148. And, as recently as *Bowers*, the Court has specifically refused to do so. *Id.* (right to privacy does not include right to engage in homosexual activity); *see also Kelley v. Johnson*, 425 U.S. 238, 244, 96 S.Ct. 1440, 1444, 47 L.Ed.2d 708, 714 (1976) (right to privacy does not afford police officer right to choose hairstyle); *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed. 2d 405, 420 (1976) (right to privacy does not include protection of reputation); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 66, 93 S.Ct. 2628, 2640, 37 L.Ed.2d 446, 462 (1973) (right to privacy does not include right of adults to view obscene movies in places of public accommodation). So, while rights of privacy have been found in the shadows of specific constitutional provisions, there will be considerable reluctance to recognize new rights of privacy that stray from those categories already established.

■ We fail to see how Hartog's claimed right to decide whether to buckle up resembles those liberty interests the Supreme Court has explicitly recognized to be part of the right of privacy implicit in the due process clause of the fourteenth amendment. Granted, Iowa's seat belt law does restrict Hartog's freedom of choice and, in that sense, does affect his interest in liberty. The law, however,

> does not regulate those intimate decisions relating to marriage, procreation, child rearing, education or family that have heretofore been recognized as deserving of heightened constitutional protection.

*People v. Kohrig*, 113 Ill.2d 384, 395, 101 Ill.Dec. 650, 653, 498 N.E.2d 1158, 1161 (1986) (right of privacy does not include right to choose whether to use seat belts), *appeal dismissed*, 479 U.S. 1073, 107 S.Ct. 1264, 94 L.Ed.2d 126 (1987).

In these circumstances,

> [w]e are unwilling to graft onto the Constitution a right of privacy to decide whether ... to wear a safety belt where there is no textual basis or a clear historical precedent for such a right in the language of the Constitution or the opinions of the Supreme Court. To do so would place [us] in a position of acting as a super-legislature, nullifying laws it does not like. That is not our proper role in a democratic society.

*Kohrig*, 113 Ill.2d at 396, 101 Ill.Dec. at 654, 498 N.E.2d at 1162.

We hold, therefore, that Iowa's seat belt law does not violate Hartog's right of privacy under the due process clause of the fourteenth amendment.

■ Moreover, we decline to infer a right of privacy to make such a choice from the words of our own due process clause in article I, section 9 of the Iowa Constitution. We decline to do so for two reasons. First, we have historically held that one's authority to drive on the public highways in Iowa does not rise to the level of a right. *See Gooch v. Iowa Dep't of Transp.*, 398 N.W. 2d 845, 847 (Iowa 1987); *Veach v. Iowa Dep't of Transp.*, 374 N.W.2d 248, 249 (Iowa 1985) (operating motor vehicle is a privilege which is not unrestrained; challenged statutes implicated "neither a fundamental right nor a suspect classification"). Such holdings thus belie any notion that one has a fundamental right under our state constitution to decide whether to wear seat belts. One's right to make this decision can surely rise no higher than one's right to drive at all. Second, given the textual similarity between the two due process clauses, we have been inclined in the past to follow Supreme Court interpretations in these circumstances. *See Gooch*, 398 N.W.2d at 848. We see no compelling reason to depart from that practice here.

We hold that Iowa's seat belt law does not violate any right to privacy arising out of article I, section 9 of the Iowa Constitution.

Several appellate courts have squarely faced and rejected a right of privacy challenge to a seat belt law. *See People v.*

*Coyle,* 204 Cal.App.3d Supp. 1, 4, 251 Cal. Rptr. 80, 82 (1988); *Kohrig,* 113 Ill.2d at 391–97, 101 Ill.Dec. at 652–54, 498 N.E.2d at 1160–62; *Wells v. State,* 130 Misc.2d 113, 119, 495 N.Y.S.2d 591, 596 (1985); *Richards v. State,* 743 S.W.2d 747, 749–50 (Tex.App.1987), *appeal dismissed,* —— U.S. ——, 109 S.Ct. 1105, 103 L.Ed.2d 170 (1989). We have found no appellate decision to the contrary. Our reasoning in rejecting the right of privacy challenge here closely parallels the reasoning in *Kohrig.* One commentator apparently agrees with this approach. *See* Note, *Constitutional Law: Seat Belt Laws and the Right to Privacy—People v. Kohrig,* 10 Harv.J.L. & Pub.Pol'y 752, 755 (1987).

Finally, legislation requiring motorcycle headgear—legislation conceptually similar to seat belt legislation—has been upheld against right of privacy challenges. *See, e.g., State v. Eighth Judicial Dist. Court,* 101 Nev. 658, 661, 708 P.2d 1022, 1024 (1985); *Arutanoff v. Metropolitan Gov't of Nashville,* 223 Tenn. 535, 542–43, 448 S.W.2d 408, 412 (1969). The rationale for rejecting such challenges is graphically captured by the Nevada supreme court in this oft-quoted passage:

> "There is no place where any such right to be let alone would be less assertable than on a modern highway with cars, trucks, busses, and cycles whizzing by at sixty or seventy miles an hour. When one ventures onto such a highway, he must be expected and required to conform to safety regulations and controls, including some that would neither have been necessary nor reasonable in the era of horse-drawn vehicles."

*State v. Eighth Judicial Dist. Court,* 101 Nev. at 661, 708 P.2d at 1024 (quoting *Bisenius v. Karns,* 42 Wis.2d 42, 55, 165 N.W.2d 377, 384 (1969)). We think the same reasoning applies here.

Hartog raises an additional argument to support his right of privacy contention. He points out that in *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923), the Supreme Court recognized that the term "liberty" in the due process clause also denotes freedom from bodily restraint. We think the "bodily restraint" envisioned by the *Meyer* Court was more akin to incarceration than to the "restraint" Hartog is required to fasten in his car. *See* 2 Rotunda, § 17.4, at 212–13 (government may not incarcerate or physically restrain without fair procedures).

In summary, because no fundamental right is implicated here, the burden is on Hartog to negate any rational basis for the seat belt law, an issue we next address.

### IV. Police Power.

Hartog next contends that Iowa Code section 321.445(2) violates the due process clauses of the federal and Iowa constitutions because the statute lies beyond the reach of the state's police power. In support of this contention, Hartog argues that the purpose of the statute is to protect the individual from his own folly and, consequently, such purpose has no relation to the public health, safety, or welfare. Implicit in Hartog's argument is that the decision whether to wear a seat belt is a personal one affecting him only; therefore, he should be able to make that decision free of state interference.

In determining whether Iowa's mandatory seat belt law is constitutional, our function is not to decide whether the law is desirable or necessary. The issue here is " 'not what the legislature should do but what the legislature can do.' " *Richards,* 743 S.W.2d at 749.

Hartog raises a fundamental issue: whether Iowa's mandatory seat belt law constitutes a valid exercise of the state's police power.

■ The term "police power" refers to the legislature's broad, inherent power to pass laws that promote the public health, safety, and welfare. *See Barbier v. Connolly,* 113 U.S. 27, 31, 5 S.Ct. 357, 359, 28 L.Ed. 923, 925 (1885); *State v. United States Express Co.,* 164 Iowa 112, 138, 145 N.W. 451, 461 (1914).

■ The legislature has considerable discretion in determining what constitutes the public health, safety, and welfare. That is why courts grant such legislation a highly

deferential standard of review. *See Reinman v. City of Little Rock*, 237 U.S. 171, 177, 35 S.Ct. 511, 513, 59 L.Ed. 900, 903 (1915). Such laws are thus presumed to be constitutional provided there is some reasonable relation to the public welfare. *Atchison T. & S.F.R.R. v. Matthews*, 174 U.S. 96, 104, 19 S.Ct. 609, 612, 43 L.Ed. 909, 912 (1899); *Hubbell v. Higgins*, 148 Iowa 36, 40, 126 N.W. 914, 916 (1910). Anyone challenging such laws must overcome this presumption by negating every reasonable basis upon which the laws may be sustained. *State ex rel. Iowa Dep't of Health v. Van Wyk*, 320 N.W.2d 599, 605 (Iowa 1982).

Nevertheless, there are certain parameters to the state's police power. Those parameters were articulated in *Lawton v. Steele:*

> [A] large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. To justify the state in thus interposing its authority on behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose....

152 U.S. 133, 136–37, 14 S.Ct. 499, 501, 38 L.Ed. 385, 388 (1894) (citation omitted).

One commentator has explained the *Lawton* parameters in the context of a police power challenge to a mandatory seat belt law:

> The parameters of the police power are thus defined by a two-part test: first, any law must address a "public" need, as distinguished from a law directed at a particular class of individuals with no impact on the general public and, second, the law's provisions must be reasonably related to the accomplishment of the public purpose. Therefore, in order for a statute to be within the state's police power, its provisions must be reasonably related to the public health, safety, and welfare. This is the benchmark against

which the mandatory seat belt law must be measured.

Compton, *Freedom to be Foolish? L.B. 496: The Mandatory Seat Belt Law*, 19 Creighton L.Rev. 743, 750 (1986). We have defined the parameters similarly by requiring the following balancing test: does the collective benefit outweigh the specific restraint? *Benschoter v. Hakes*, 232 Iowa 1354, 1361, 8 N.W.2d 481, 485 (1943).

With these principles in mind we turn to Hartog's police power challenge.

Concededly, the statute here is designed to protect the driver and front seat passenger from serious injury or death. So there is merit in Hartog's argument that the statute interferes with the individual's choice concerning his or her own safety. The issue immediately narrows to whether the first part of the *Lawton* two-part test is met: does the seat belt law really protect the health, safety, and welfare of the *public* or, as Hartog argues, is the decision whether to wear a seat belt an individual one which affects no one but the individual involved. For reasons that follow we think the public safety and welfare are served by the seat belt statute.

Several courts have rejected the argument Hartog raises, that is, that his unwillingness to use seat belts places only himself at risk. These courts point out that seat belt use enhances a driver's ability to maintain control of the car and avoid injuries not only to the driver but to others. *Kohrig*, 113 Ill.2d at 400–01, 101 Ill.Dec. at 656, 498 N.E.2d at 1164; *People v. Weber*, 129 Misc.2d 993, 996–97, 494 N.Y.S.2d 960, 963 (1985); *State v. Swain*, 92 N.C.App. 240, 241, 374 S.E.2d 173, 174 (1988); *Richards*, 743 S.W.2d at 749. Similarly, an unrestrained front seat passenger can interfere with the ability of a driver to respond to a collision. *Kohrig*, 113 Ill.2d at 401, 101 Ill.Dec. at 656, 498 N.E.2d at 1164. Several commentators in recent writings have agreed. *See, e.g.*, Benguerel, *Mandatory Seat Belt Legislation: Panacea for Highway Traffic Fatalities?*, 36 Syracuse L.Rev. 1341, 1347–48 (1986); Note, *The Seat Belt Defense and North Carolina's*

*New Mandatory Usage Law,* 64 N.C.L. Rev. 1127, 1131 (1986).

Moreover, studies have shown that such an unrestrained passenger poses danger of injuries to other occupants through direct or indirect body contact brought about by occupant kinetics. For example, instances have occurred in which a person holding a small child has been thrown forcibly against the child, crushing the child to death. *See* Werber, *A Multi–Disciplinary Approach to Seat Belt Issues,* 29 Clev.St. L.Rev. 217, 228–29 (1980); Hulke, Sherman & O'Day, *The Hazard of the Unrestrained Occupant,* 16 J.Trauma 383 (1978).

It is readily apparent to us that the legislature could rationally conclude unbelted drivers and passengers endanger the safety of others. *See Kohrig,* 113 Ill.2d at 400, 101 Ill.Dec. at 656, 498 N.E.2d at 1164. Preventing and reducing resulting injuries seem to us to be valid state interests. *See Weber,* 129 Misc.2d at 997, 494 N.Y.S.2d at 963.

Although the legislature's failure to require all occupants to use seat belts weakens our conclusion, this failure is not fatal constitutionally. The law

> "need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."

*Kohrig,* 113 Ill.2d at 402–03, 101 Ill.Dec. at 657, 498 N.E.2d at 1165; *accord Richards,* 743 S.W.2d at 749 (answering argument that seat belt law was inconsistent with aim to reduce injuries and therefore unconstitutional because back seat passengers were not required to wear seat belts).

We think the seat belt law promotes the public interest in another way: reducing the public costs associated with serious injuries and deaths caused by automobile accidents. As one court has pointed out,

> the police power relates not merely to the public health and public physical safety, but also to public financial safety, and ... laws may be passed within the

police power to protect the public from financial loss.

*Love v. Bell,* 171 Colo. 27, 33, 465 P.2d 118, 121 (1970) (holding that a motorcycle head-gear statute was constitutional against a police power challenge); *accord Kohrig,* 113 Ill.2d at 403–05, 101 Ill.Dec. at 657–58, 498 N.E.2d at 1165–66 (recognizing economic welfare as a state interest promoted by seat belt law); *Weber,* 129 Misc.2d at 995–96, 494 N.Y.S.2d at 962–63 (same); *Swain,* 92 N.C.App. at 241, 374 S.E.2d at 174 (same); *Richards,* 743 S.W.2d at 749 (same).

Contrary to Hartog's contention, automobile occupants who do not buckle up and as a result are seriously injured may directly affect the public because

> [f]rom the moment of the injury, society picks the person up off the highway; delivers him to a municipal hospital and municipal doctors; provides him with unemployment compensation if, after recovery, he cannot replace his lost job, and, if the injury causes permanent disability, may assume the responsibility for him and his family's continued subsistence. We do not understand a state of mind that permits [such a person] to think that only he himself is concerned.

*Simon v. Sargent,* 346 F.Supp. 277, 279 (D.Mass.), *aff'd,* 409 U.S. 1020, 93 S.Ct. 463, 34 L.Ed.2d 312 (1972).

Statistics certainly bear out the staggering direct and indirect costs attributable to injuries and deaths from automobile accidents. One commentator cites these statistics in support of using the police power to require the use of seat belts as a means of protecting the public treasury:

> The direct and indirect economic costs of these injuries and deaths is staggering. In 1977, the costs attributable to wage loss, medical expenses, insurance administration and property damage from motor vehicle accidents was 30.5 billion dollars. In 1978, the National Safety Council reported that 34.2 billion dollars was attributable to motor vehicle accidents. These statistics do not include the massive costs incurred by public agencies involved in automobile accident

situations (such as police, fire, and ambulance services, and the judiciary), indirect losses to employers from off-the-job accidents, commercial cargo losses, or damages awarded through litigation in excess of direct loss. Assuming that the economic loss for motor vehicle related injuries and deaths in 1979 will approximate those of 1977 and 1978, the total calculated loss for these three years is in the range of 90 to 100 billion dollars. A reasonable society would embrace the opportunity to reduce these costs.

Werber, 29 Clev.St.L.Rev. at 222.

Closer to home, Governor Branstad gave similar reasons for signing into law Iowa's mandatory seat belt law:

In signing Senate File 499, I have carefully considered the concerns of many Iowans who feel this legislation is an unnecessary intrusion by government. I have weighed these objections with the state's responsibility to provide and promote public safety. *I have concluded that the saving of lives, reduction of injuries, and saving of cost related to accidents warrant my signature on this Act.*

There is a traffic accident every 8.6 minutes in our state, and one out of every 20 Iowa drivers will be involved in an accident every year. In 1984, traffic accidents claimed 420 lives in Iowa, and nearly 28,000 people were injured.

The human tragedy and financial costs associated with these traffic accidents are staggering. *The Iowa Department of Public Safety and other organizations have estimated that as many as 150 to 200 lives could be saved annually with the passage of this Act. Accident investigation reports also suggest that another 2800 Iowans could avoid serious injury simply by "buckling up."*

In addition to saving lives and reducing the severity of traffic accidents, *this legislation will also save the motoring public, society, and state and local government millions of dollars. Medical costs, productivity losses, insurance expense, workers' compensation and a variety of other costs associated with*

*motor vehicle accidents can be substantially reduced through better utilization of safety belts.*

Canada and most of Europe require seat belts and seventeen other American states already have some form of mandatory seat belt law. The collective experience from these laws document an unmistakable fact: that this law will reduce injuries and fatalities.

(Emphasis added.)

It can scarcely be argued that the Iowa legislature could not have rationally considered the same reasons in passing the statute.

Moreover, we think that

the right to operate a motor vehicle upon a public street or highway is not a natural or unrestrained right, but a privilege which is subject to reasonable regulation under the police power of the state in the interest of the public safety and welfare.

*City of Wichita v. White,* 205 Kan. 408, 410, 469 P.2d 287, 289 (1970). As one commentator aptly points out:

The government provides roads as a service to its citizens, and part of that service is assuring that these roads will be safe and efficient. The motorist is not being overly imposed upon when asked to comply with minimal standards of behavior designed to reduce the dangers of his driving to other drivers. It is also difficult to object to the state's attempt to stop an individual from making the rest of society pay for the consequences of his risk-taking. Under a system of laissez-faire one could argue that a person's risk-taking would be his own business, but as the court noted in *Kohrig* our government provides services from the ambulance that delivers the injured motorist to the hospital to disability insurance. Having to buckle up may be inconvenient, but it is not an unreasonable price to pay for the use of public roads.

Note, 10 Harv.J.L. & Pub.Pol'y at 757.

We hold that passage of Iowa Code section 321.445(2) was a proper exercise of the state's police power and does not violate

the due process provisions of the federal and Iowa constitutions.

### V. *Disposition.*

Iowa Code section 321.445(2) does not violate any right of privacy nor does it exceed the state's police power. Accordingly, the due process challenges mounted here under the fourteenth amendment to the United States Constitution and under article I, section 9 of the Iowa Constitution must fail.

Finding no error, we affirm.

AFFIRMED.