AMERICAN MOTORCYCLE ASSOCIATION *v.*
DEPARTMENT OF STATE POLICE.

1. CONSTITUTIONAL LAW—HIGHWAY SAFETY—MOTORCYCLES—CRASH
   HELMETS.
   The interest of the State in highway safety and in keeping its
   citizens healthy and self-supporting *held*, not to extend to re-
   quiring motorcyclists and their riders to wear crash helmets
   (PA 1949, No 300, § 658[d], as added by PA 1966, No 207).

2. SAME—POLICE POWER—PUBLIC HEALTH, SAFETY, MORALS—GEN-
   ERAL WELFARE.
   The test of legitimacy of the exercise of the police power is the
   existence of a real and substantial relationship between the
   exercise of that power in a particular manner in a given case
   and the public health, safety, morals, or the general welfare.

3. SAME—STATUTES—MOTORCYCLES—CRASH HELMETS.
   Statute requiring drivers and riders of motorcycles to wear
   crash helmets has a relationship to the protection of the
   individual from himself, but not to the public health, safety,
   and welfare (US Const, Am 9; PA 1949, No 300, § 658[d],
   as added by PA 1966, No 207).

4. AUTOMOBILES—MOTORCYCLES—CRASH HELMETS—STATUTES—CON-
   STITUTIONAL LAW.
   Summary judgment for defendants in action challenging con-
   stitutionality of statute requiring the driver or rider of a
   motorcycle to wear a crash helmet and subjecting them to
   criminal punishment for violation of a statute *held*, error,
   where the statute regulates actions of the individual having no
   direct relationship to the public health, safety, and welfare
   (US Const, Am 9; PA 1949, No 300, § 658[d], as added by
   PA 1966, No 207).

REFERENCES FOR POINTS IN HEADNOTES
[1–4]  7 Am Jur 2d, Automobiles and Highway Traffic § 18.
[5]  5 Am Jur 2d, Appeal and Error § 1009.

5. Costs—Public Question—Motorcycles—Crash Helmets.

No costs are allowed in action for declaration of rights as to
constitutionality of statute requiring motorcyclists and their
passengers to wear crash helmets, a public question being in-
volved (PA 1949, No 300, § 658[d], as added by PA 1966,
No 207).

Appeal from Ingham; Robinson (Richard), J.,
presiding. Submitted Division 2 March 1, 1968, at
Lansing. (Docket No. 4,445.) Decided April 30,
1968. Leave to appeal denied July 23, 1968. See
381 Mich 763.

Complaint by American Motorcycle Association,
an Ohio corporation, and Harold D. Farnam, against
the Director of the Department of State Police and
the Department of State Police for declaration of
rights as to constitutionality of the amendment to
motor vehicle code requiring motorcyclists and rid-
ers to wear crash helmets. Summary judgment for
defendant. Plaintiffs appeal. Reversed.

*Fraser, Trebilcock, Davis & Foster,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, *Stewart H. Freeman,*
Assistant Attorney General, and *Edwin M. Bladen,*
Assistant Deputy Attorney General, for defendants.

A. C. Miller, J. This is a review of a summary
judgment[1] granted in a proceeding requesting a
declaration of rights as to the constitutionality of
the amendment[2] to the motor vehicle code requiring
motorcyclists and riders to wear crash helmets.
 Plaintiffs challenge the act on the grounds that
it violates the due process and reserved powers

---

[1] GCR 1963, 117.2.
[2] PA 1949, No 300, § 658(d), as added by PA 1966, No 207 (CL
1948, § 257.658[d] [Stat Ann 1968 Cum Supp § 9.2358[d]]).

clauses of the Michigan Constitution[3] and the due process, equal protection, and right of privacy provisions of the Ninth and Fourteenth Amendments of the Constitution of the United States.[4]

The statute in question reads as follows:

"A person operating or riding on a motorcycle or motor driven cycle shall wear a crash helmet approved by the department of state police. The department shall promulgate rules for the implementation of this section in accordance with the provisions of Act No. 88 of the Public Acts of 1943, as amended, being sections 24.71 to 24.80 of the Compiled Laws of 1948, and subject to Act No. 197 of the Public Acts of 1952, as amended, being sections 24.101 to 24.110 of the Compiled Laws of 1948."

Failure to wear the helmet by either the driver or rider of a motorcycle subjects such persons to criminal penalties provided for violation of the motor vehicle code.

It is contended by the plaintiffs that the legislative concern is solely related to the safety of the motorcyclist and passenger and can have no possible relationship to the safety and well-being of other persons, much less the public at large. Based on the premise that the individual in our society is still master of his fate and captain of his soul, plaintiffs cite the following maxim:

"The maxims are, first, that the individual is not accountable to society for his actions, insofar as these concern the interests of no person but himself." John Stuart Mill, Utilitarianism, Liberty and Representative Government, E. P. Dutton & Co. Inc. (1930 ed, p 149).

---

[3] Mich Const 1963, art 1, §§ 17 and 23.

[4] US Const, Ams 9 and 14.

This is consistent with the time honored maxim:

*"Sic utere tuo ut alienum non laedos."* (So use your own that you do not injure that of another.)

This maxim has been the basis for a decision by a learned circuit judge of this State,[5] two trial level decisions in New York State,[6] one in the City of Seattle,[7] and an attorney general opinion, State of New Mexico.[8] There is support in the language of Michigan Supreme Court decisions for this maxim. In *People* v. *Armstrong* (1889), 73 Mich 288, 295 (2 LRA 721), the Court said:

> "Under our Constitution and system of government the object and aim is to leave the subject entire master of his own conduct, except in the points wherein the public good requires some direction or restraint."

General principles are enunciated in 2 Cooley, Constitutional Limitations (8th ed), p 1226 and in 16 Am Jur 2d, Constitutional Law §§ 359, 360, p 684, *et seq.,* and § 287, pp 557–560.

The only case found in which the police power has been urged to require one to protect himself from himself is *Mugler* v. *Kansas* (1887), 123 US 623,(8 S Ct 273, 31 L Ed 205). In that case the prohibition law of Kansas was attacked as a deprivation of property without due process of law. The broad implications of such regulations were argued as follows (pp 659, 660):

> "It is, however, contended, that although the State may prohibit the manufacture of intoxicating

---

[5] Judge Charles Kaufman, Wayne Circuit #44835, *People* v. *Duncan* (1967).

[6] *People* v. *Smallwood* (1967), 52 Misc 2d 1027 (277 NYS2d 429); and *People* v. *Carmichael* (1967), 53 Misc 2d 584 (279 NYS2d 272).

[7] *City of Seattle* v. *Zelctzer,* Seattle Municipal Court Department #3.

[8] OAG, N Mex Feb. 1, 1966, #66–15, p 19.

liquors for sale or barter within her limits, for general use as a beverage, 'no convention or legislature has the right, under our form of government, to prohibit any citizen from manufacturing for his own use, or for export, or storage, any article of food, or drink not endangering or affecting the rights of others.' The argument made in support of the first branch of this proposition, briefly stated, is, that in the implied compact between the State and the citizen certain rights are reserved by the latter, which are guaranteed by the constitutional provision protecting persons against being deprived of life, liberty, or property, without due process of law, and with which the State cannot interfere; that among those rights is that of manufacturing for one's use either food or drink; and that while, according to the doctrines of the Commune, the State may control the tastes, appetites, habits, dress, food, and drink of the people, our system of government, based upon the individuality and intelligence of the citizen, does not claim to control him, except as to his conduct to others, leaving him the sole judge as to all that only affects himself."

In this case the Court sustained the legislation because to permit individual manufacture "would tend to cripple, if it did not defeat, the effort to guard the community" (p 662) and ruled (p 663):

"No one may rightfully do that which the lawmaking power, upon reasonable grounds, declares to be prejudicial to the general welfare."

No such enforcement problem can be urged to sustain the legislation here in question.

Does a direct relationship to the public health, safety and welfare exist in the present case?

It is urged that the motorcycle is susceptible to loss of control because it has just two wheels and that other vehicles frequently pick up stones from

the road or roadside and throw them at the head of the cyclist causing him to lose control and cross the centerline or otherwise injure others. This was the basis of two New York rulings. In *People* v. *Schmidt* (1967), 54 Misc 2d 702, 703, (283 NYS 2d 290, 292), the court said:

"The remaining question concerns the power of the State to regulate individual conduct. The court takes judicial notice of certain dangers inherent in the operation of motorcycles as compared to that of automobiles. The danger of flying stones or other objects from the wheels of moving vehicles is a real one. A blow on the head of a cyclist not only could endanger himself, but be the cause of injury or death to other users of the public highways. To prevent such possible occurrences is a valid objective for legislative action under the general police power of the State."

And in *People* v. *Bielmeyer* (1967), 54 Misc 2d 466, 469 (282 NYS2d 797, 801), the court reasoned:

"The old joke about the happy motorcyclist—'the one with the bugs on his teeth'—is not too funny when one hears or reads about instances where cyclists have been hit with hard-shelled beetles or bees and have lost control of their bikes, causing damage and injuries to others."

The New York judge pointed out that motorcyclists normally ride near the edge of the road. In Michigan the law so requires. (CLS 1961 § 257-.660[a] [Stat Ann 1968 Cum Supp § 9.2360(a)].)

Nevertheless, such reasoning is obviously a strained effort to justify what is admittedly wholesome legislation.[9] If the purpose truly were to

---

[9] Michigan State Police datum 1962–66 (Exhibit A) show a mortality rate of 11.5 for 10,000 registrations of motorcycles, as compared with 5.2 per 10,000 for all vehicles in the same period.

deflect flying objects, rather than to reduce cranial injuries, a windshield requirement imposed on the manufacturer would bear a reasonable relationship to the objective and not vary from the norm of safety legislation customarily imposed on the manufacturer for the protection of the public rather than upon the individual.

The attorney general further contends that the State has an interest in the "viability" of its citizens and can legislate to keep them healthy and self-supporting. This logic could lead to unlimited paternalism. A further contention pertains to the doctrine of *parens patriae,* the special relationship of the State to youth, but this has little merit since the statute is not so limited.

There can be no doubt that the State has a substantial interest in highway safety. In *Smith* v. *Wayne County Sheriff* (1936), 278 Mich 91, 96, the Court said:

"It is well settled that the legislature has the power to control and regulate the use of the highways."

but the difficulty with adopting this as a basis for decision is that it would also justify a requirement that automobile drivers wear helmets or buckle their seat belts for their own protection!

These arguments all prove too much. As stated in *Shelton* v. *Tucker* (1960), 364 US 479, 488 (81 S Ct 247, 252, 5 L Ed 231) at 488:

"In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."

Reference has also been made to the labor law field. *New York Central Railroad Company* v. *White* (1917), 243 US 188 (37 S Ct 247, 61 L Ed 667, Ann Cas 1917D, 629), and *Withey* v. *Bloem* (1910), 163 Mich 419 (35 LRA NS 628). These laws have been sustained as a regulation of the employer for the benefit of the employee and are, therefore, clearly distinguishable.

The principle that a presumption of validity attaches to legislation is recognized. This was stated in *Cady* v. *City of Detroit* (1939), 289 Mich 499, 505:

"A statute will be presumed to be constitutional by the courts unless the contrary clearly appears; and in case of doubt every possible presumption not clearly inconsistent with the language and the subject matter is to be made in favor of the constitutionality of legislation."

This presumption cannot be the basis for the courts to abdicate their responsibility. Legislation must meet the test set forth in the recent case of *Grocers Dairy Company* v. *Department of Agriculture Director* (1966), 377 Mich 71, 76, quoting *Roman Catholic Archbishop of Detroit* v. *Village of Orchard Lake* (1952), 333 Mich 389, 392, as follows:

"The test of legitimacy of the exercise of the police power is 'the existence of a real and substantial relationship between the exercise of those powers in a particular manner in a given case and the public health, safety, morals, or the general welfare.' "

This statute has a relationship to the protection of the individual motorcyclist from himself, but not to the public health, safety, and welfare.

A discussion of the problem leads one to speculate on an analogy to suicide. This was a common-law

crime (4 *Blackstone*, Homicide [Chap 14 (Gavit's ed, 1940) p 830]. See 92 ALR 1180), but it is not a statutory crime in Michigan. Our attorney general has opined that we did not adopt that part of the common law because of the abhorrent penalty. 1943 OAG 342.

Plaintiffs rely also upon the reserved powers under the Ninth Amendment to the United States Constitution and cite the recent decision[10] wherein Justice Goldberg, concurring, invoked this amendment to invalidate a Connecticut statute making the use of contraceptives a criminal offense.. In holding that the use of contraceptives by the individual was a private right of the individual free from State coercion and control, he equated this right with the right "to be let alone". Justice Louis Brandeis stated this principle in his famous dissent in *Olmstead* v. *United States* (1928), 277 US 438, 478, 479 (48 S Ct 564, 572, 72 L Ed 944, 956, 957, 66 ALR 376, 391).

"The makers of our Constitution   *   *   *   sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone —the most comprehensive of rights and the right most valued by civilized men.   *   *   *

"Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."

---

[10] *Griswold* v. *Connecticut* (1965) 381 US 479, 494 (85 S Ct 1678, 1687, 14 L Ed 2d 510, 521).

The precedential consequences of "stretching our imagination"[11] to find a relationship to the public health, safety and welfare, require the invalidation of this statute.

Reversed, but without costs, it being a public question.

McGregor, P. J., and J. H. Gillis, J., concurred.

---

[11] Judge Kaufman, *supra,* "Here it just affects the individual, and while the individual is a member of the general public, his activity in doing what has been determined by the legislature to be a crime cannot in any way affect the general public unless one would stretch his imagination."