STATE OF HAWAII *v.* ALFRED LEE
also known as ALFRED SAMUEL F. M. MOY.

No. 4793.

FEBRUARY 12, 1970.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ.,
AND CIRCUIT JUDGE M. DOI FOR
KOBAYASHI, J., DISQUALIFIED.

OPINION OF THE COURT BY RICHARDSON, C.J.

Appellant was cited on May 15, 1968, for failing to wear a safety helmet as required by HRS § 286-81(1)(A): "No person shall: (1) Operate a motorcycle or motor scooter on any highway in the State unless he and any passenger he carries on the motorcycle or motor scooter wears (A) a safety helmet securely fastened with a chin strap . . . ." Appellant was convicted. He appeals from a judgment sustaining the constitutionality of the statute.

"The term 'police power' connotes the time-tested conceptional limit of public encroachment upon private interests. . . . The classic statement of the rule in *Lawton* v. *Steele,* 152 U.S. 133, 137 (1894), is still valid today: 'To justify the State in [thus] interposing its authority in behalf of the public, it must appear, first, that the interests of the public [generally, as distinguished from those of a particular class] require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals.' " *Goldblatt* v. *Hempstead,* 369 U.S. 590, 594 (1962).

Appellant argues that the first precondition required by the due process clause of the U. S. Constitution to the exercise of the police power by the legislature enumerated above, namely, "it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference" has not been met. He contends that other members of the public at large are not affected in a deleterious manner, if indeed at all, by the conduct regulated by this statute; that the only realistic effect of the statute is to compel motorcyclists to take precautionary measures so that they will not harm themselves; that harm to self or harm to a particular class is not within the public interest and is outside the scope of the police power to legislate in the public interest.

The State argues that decreasing fatalities and injuries

from motorcycle accidents does impinge directly on the public interests in three respects: (1) economic impact: (a) lessens burden on public agencies such as hospitals, medical and ambulance facilities; (b) reduces addition to the public assistance roles of disabled motorcyclists and their dependents or survivors; (2) "flying missile theory": loose stones on the highway or fallen objects may strike the motorcyclist on the head, thus causing him to lose control and become a menace to other vehicles on the highway; (3) the increase in fatalities and serious injuries is so alarming, so widespread and of such grave dimension that it threatens the very fabric of society.

The legislature has clearly stated its purpose. "Deaths of persons and injuries to them and damage to property with the other losses suffered on account of highway traffic accidents are of grave concern to the State and its citizens as well as to the federal government. The legislature finds and declares that it is in the public interest that the State initiate, coordinate and accelerate every available means to decrease the fatalities, injuries, damages and losses resulting from highway traffic accidents." S.L.H. 1967, c. 214, § 1.

It is true that courts often attribute to statutes the constitutionally permissible objectives which the statute might plausibly be construed to reflect, rather than that purpose which the statute in fact, or most probably, reflects. See, e.g., Two Guys from Harrison-Allentown, Inc., v. McGinley, 366 U.S. 582 (1961); McGowan v. Maryland, 366 U.S. 420 (1961). However, where the legislature has clearly stated its purpose, we are reluctant to attribute other purposes, unless the facts underlying such other purposes are clearly and convincingly shown. In this case the legislature has not alluded to either "economic impact" or the "flying missile theory", there was no evidence introduced by the State to substantiate either argument,

and the claimed facts are not susceptible to judicial notice.

Thus we are squarely faced with the issue whether the legislature may constitutionally regulate the conduct of an individual so as to require him to protect himself from physical injury and or death; that is, whether physical harm to self is a proper subject of public interest and thus subject to the police power of the legislature. This case raises a question that goes to the very heart of the nexus between the individual and the state: where does the public interest begin? This is particularly difficult where the purpose of the statute is beneficent, as Justice Brandeis pointed out in his dissent in *Olmstead* v. *United States,* 277 U.S. 438, 479 (1928) : "Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well meaning, but without understanding."

It is contended that the increase in fatalities and serious injuries largely to people under 25 due to motorcycle accidents is so alarming, so widespread and of such grave dimension that it threatens the very fabric of society. It would seem a necessary implication of such contention that when the physical harm to a group of people due to their own recklessness or imprudence becomes sufficiently widespread the public interest generally is affected. Unfortunately, the State merely asserts this proposition without offering statistical evidence to document the degree and extent of the claimed epidemic of motorcycle injuries and fatalities. However, there is statistical evidence available which is properly susceptible of judicial notice.

The Secretary of Transportation's report, "National Uniform Standards for State Highway Safety Programs", H.R. Doc. No. 138, 90th Cong., 1st Sess. (1967), which

set up the motorcycle safety helmet as a minimum standard to which state highway safety programs must conform, contained the following background information:

"Deaths and injuries from motorcycle accidents doubled between 1963 and 1965. This fact is particularly alarming when it is understood that most of those killed and injured were young people under the age of 25. Motorcycle registrations have jumped from 574,080 in 1960 to 1,914,700 in 1966. By 1970 the annual increase is expected to reach 1 million per year. Motorcycle safety takes on grave dimensions in view of the fact that since 1960 the rate of motorcycle fatalities has increased at about the same rate as the number of motorcycles [*i.e.*, almost 3½ times in 6 years]."

The New York Department of Motor Vehicles' statistics:

"A summary of the Department statistics indicates that 89.2% of the motorcycle accidents result in injury or death and that almost all fatalities occurring as a result of such accidents involve head injuries. Most of these fatalities could have been avoided, or the severity lessened, by the use of a proper helmet." N.Y. Session Laws 2961, 2962 (McKinney 1966).

Michigan State Police data:

"Michigan State Police datum 1962-1966 (Exhibit A) shows a mortality rate of 11.5 for 10,000 registrations of motorcycles, as compared with 5.2 per 10,000 for all vehicles in the same period." *American Motorcycle Ass'n* v. *Davids,* 158 N.W. 2d 72, 75 n.9 (Mich. App. 1968). However, this figure is not reflective of the total statewide picture since ". . . accidents which occurred in cities over 25,000 population [were] not included in this summary." Brief for Defendants and Appellees in *American Motorcycle Ass'n* v. *Davids, supra.*

· In our opinion these statistics fairly show that motorcycle accidents are significantly more dangerous than motor vehicle accidents; that there is an enormous increase in motorcycle registrations; that there is a corresponding enormous increase in the number of deaths and injuries due to motorcycle accidents. The question is whether the accelerating rate of deaths and injuries due to motorcycle accidents coupled with the increase in motorcycle registrations has reached such proportions and the class of motorcycle users has become so large and widespread that the continued viability of our society requires that they protect themselves from physical injury or death—in short, is the public interest generally affected?

We hold that it is.

We wish to make it clear that this holding is limited to this case. We start from the proposition that where an individual's conduct, or a class of individuals' conduct, does not directly harm others the public interest is not affected and is not properly the subject of the police power of the legislature. However, where the legislature has determined that the conduct of a particular class of people recklessly affects their physical well-being and that the consequent physical injury and death is so widespread as to be of grave concern to the public and where the incidence and severity of the physical harm has been statistically demonstrated to the satisfaction of the court, then the conduct of that class of people affects the public interest and is properly within the scope of the police power. Of course, where the conduct sought to be regulated is in furtherance of a specific constitutional right, a different situation arises.

Having determined "that the interests of the public generally, as distinguished from those of a particular class" is involved, we move on to consider whether "the means are reasonably necessary for the accomplishment of

the purpose." Appellant has not referred us to any arguments refuting the reasonableness of the regulation in light of its purpose. Nor has appellant pointed the way to less drastic or less burdensome means by which substantial head injuries to motorcyclists may be prevented. The burden imposed is directly and immediately related to the evil sought to be controlled. The legislation is not broadly prohibitive; a narrower means to protect motorcyclists could hardly be conceived.

Appellant also contends that the standard "safety helmet" in the statute is indefinite and subject, by the terms of the regulations, to amendment without notice.

We find "safety helmet" to be an adequate standard by which the legislature, the courts, and the public may ascertain the reasonableness of the rules promulgated by the Coordinator. The term is one likely of general ordinary understanding upon which reasonable men may agree. We find "safeguards" by which administrative actions may be reviewed. We find in the history and purpose of the statute a policy sufficient to test regulations adopted by the Coordinator. The rule-making power of the Coordinator, like that of other administrative bodies, if exercised beyond the scope of authority or in contravention of a governing statute, a constitutional provision, or a rule-making procedure, may be challenged by any interested party in the courts without first applying to the agency. HRS § 91-7.

Since the approval of owners' helmets under the regulations may not be withdrawn at any time except after a definite period set for re-inspection, the regulations give warning sufficient to satisfy due process.

We hold that HRS § 286-81 (1) (A) and the regulations promulgated pursuant to it are within the proper exercise of police power.

Judgment affirmed.

*Francis T. De Mello* for defendant-appellant.

*John Campbell, Jr.,* Deputy Prosecuting Attorney (*Barry Chung,* Prosecuting Attorney, with him on the brief), for plaintiff-appellee.

*Dennis C. H. Leong,* Deputy Attorney General (*Bert T. Kanbara,* Attorney General, and *H. K. Bruss Keppeler,* Deputy Attorney General, on the brief), for amicus curiae.

---

CONCURRING OPINION OF M. DOI, CIRCUIT JUDGE.

I concur.

However, I believe that the purpose of HRS § 286-81(1)(A) is not narrowly confined to protection of an individual from his own folly. In its preamble, the act expresses concern over "deaths of persons and injuries to them and damage to property with other losses suffered on account of highway traffic accidents." This is sufficiently broad to embrace repercussions beyond the immediate interest of the individual alone.

A direct beneficiary of the statute's protective thrust may be the individual cyclist, but the scope of its salutary results is not confined to him. Whether by relieving further strain on emergency services or overcrowded medical facilities subsidized by government or by preventing excessive liability, criminal as well as civil, on the part of other users of the highways, all by means of guarding against the significantly increased hazards of serious injury or death to the unhelmeted cyclists in this day of heavy and highspeed traffic, there are real and practical ramifications of substantial interest to others which are well within the ambit of public purpose as distinguished from private concern.

Regulating the use of public highways in the interest of safety is a valid state object, the power with respect thereto being "broad and pervasive", "exceptional" in

scope, and carrying "a strong presumption of validity when challenged in court." *Bibb* v. *Navajo Freight Lines,* 359 U.S. 520. Appellant fails in his challenge in this case.

---

DISSENTING OPINION OF ABE, J.

As stated by the majority of the court, the issue of this case is whether the legislature may constitutionally regulate the conduct of a person for his own safety. I disagree with the majority opinion and I would hold the provision of HRS § 286-81 (1) (A) requiring appellant, a motorcyclist, to wear a helmet for his own safety unconstitutional.

Courts in other jurisdictions have declared similar laws to be unconstitutional. *People* v. *Fries,* 42 Ill.2d 446, 250 N.E.2d 149 (1969); *American Motorcycle Ass'n.* v. *Davids,* 11 Mich. Ct. App. 351, 158 N.W.2d 72 (1969).

I do not question that our legislature, recognizing the special hazards faced by motorcyclists, enacted the statute to prevent the death and injuries of our people resulting from motorcycle mishaps. Nor do I question the beneficent intent of our legislature in enacting the statute because apparently the legislation was enacted to protect immature and reckless, or careless, or foolhardy youngsters and adults, who are unwilling to protect themselves.

The general law is that a state has inherent authority under its police power to provide for the needs of the public. *Nebbia* v. *New York,* 291 U.S. 502, 524 (1934). No court has and can, I believe, provide a precise definition or standard as to the scope of police power. However, it is the generally recognized doctrine that a state may enact reasonable laws to preserve the public order, safety, health and morals. *Nebbia* v. *New York, supra; Borden Co.* v. *McCrory,* 169 F. Supp. 197 (E.D. La. 1959); *Pacific Meat Co.* v. *Otagaki,* 47 Haw. 652, 394 P.2d 618 (1964); *State* v. *Gordon,* 143 Conn. 698, 125 A.2d 477 (1956).

The United States Supreme Court in *Goldblatt.* v. *Hempstead,* 369 U.S. 590 (1962) at page 594 quotes the rule from *Lawton* v. *Steele,* 152 U.S. 133, 137 (1894):

"To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."

The majority holds that "where the legislature has determined that the conduct of a particular class of people recklessly affects their physical well being and that the consequent physical injury and death is so widespread as to be of grave concern to the public and where the incidence and severity of the physical harm has been statistically demonstrated to the satisfaction of the court, then the conduct of that class of people affects the public interest and is properly within the scope of the police power." In its decision, *Holden* v. *Hardy,* 169 U.S. 366 (1898), *Muller* v. *Oregon,* 208 U.S. 412 (1908), and *West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379 (1937) are not cited as authority; however, it would appear that the majority of the court is depending on those cases for its proposition.

The cases above cited upheld the constitutionality of statutes fixing maximum hours of labor in certain industries as a reasonable exercise of the police power to preserve public health. I would distinguish those cases from the case before us.

I agree with the majority that the safety helmet requirement is aimed at preventing a further increase in the toll highway accidents have taken of the state's citizens based on the legislative finding that highway travel presents a special hazard for motorcyclists. However, no matter how beneficent or humane the purpose of the statute, it cannot be upheld unless it is a legitimate exercise of its

police power for the public order, safety, health, morals or welfare.

I believe our State Constitution specifically recognizes one's right to be let alone. Article I, § 2 provides:

> "All persons are free by nature and are equal in their inherent and inalienable rights. Among these rights are the enjoyment of life, liberty and the pursuit of happiness, and the acquiring and possessing of property. These rights cannot endure unless the people recognize their corresponding obligations and responsibilities."

There is no question that an individual has a fundamental constitutional right to be let alone—liberty to do as he pleases—but, of course, subject to reasonable restriction under the police power.

Here, one's right to be let alone on a public highway is being infringed in that a motorcyclist is required to wear a safety helmet on pain of criminal punishment for his failure to do so. I believe that the statute in question should not be upheld as a reasonable exercise of police power although the purpose is laudable because the act is essentially a personal safety measure.

It is true that the United States Supreme Court has held that a state may legislate for miners[1] in terms of maximum hours of work and wearing apparel in the exercise of its police power for the "general welfare" or "best interest." This concept should not be extended to uphold the constitutionality of HRS § 286-81 (1) (A).

It appears that the majority, in upholding the constitutionality of the statute, is adopting the concept that an individual's liberty—the right to be let alone—may be abridged or infringed by legislative act which may be deemed for the "best interest" of that individual. I believe this principle or concept that a state may determine what

---

[1] *Holden* v. *Hardy*, 169 U.S. 366 (1898).

is in one of its citizen's "best interest" and may compel him to follow that course of action under pain of criminal punishment, unreasonably infringes upon one's fundamental liberty. My opinion is that a state may only legislate where the "general welfare" is affected, that is, where others are harmed or likely to be harmed.

I believe the right of liberty—the right to be let alone—gives one the right to determine for himself what is for his "best interest," even though many scholars have argued that there is ". . . a general decline in the belief that individuals know their own interests best, and . . . an increased awareness of a great range of factors which diminish the significance to be attached to an apparently free choice or . . . consent."[2]

Now, the majority having upheld the statute, it would appear that our legislature along the same reasoning could require drivers and passengers in motor vehicles to wear seat belts and shoulder straps, under pain of criminal punishment for their failure to do so. Also, it could require individuals who may use public streets and highways at nights to wear certain clothing manufactured from materials having reflectory characteristics for their personal safety.

Then why can't the legislature enact criminal legislation prohibiting the smoking of cigarettes or other tobacco products, or restricting or regulating foods to be consumed, for example, non-fattening food products to prevent obesity?

Are we ready to forfeit our individual liberty to a point where legislative discretion is to be the only bar to the determination as to what one may or may not do under the definition of "best interest"?

I submit that once a step is taken that the protection of an individual from himself is within the legitimate ex-

---

[2] Hart, *Law, Liberty and Morality*, pp. 32-33, 1963 (Reprinted 1965).

ercise of the police power, that is no limit to this power and a state can entirely regulate one's life and his way of living.

As I have stated, the statute is beneficent and humane, without doubt, and even eminently sensible and wise; nonetheless, I believe it is unconstitutional because it attempts to infringe upon and stifle fundamental personal liberties for one's own safety and is not concerned with the preservation of public order, safety, health and morals, or for the public welfare.

Then, the fact that the general public considers it foolhardy to ride a motorcycle without a safety helmet, that reason alone should not be used as a criterion for defining the non-use of a helmet a criminal offense.

As stated by Justice Barham in his dissent in *Everhardt* v. *City of New Orleans,* 253 La. 285, 300, 217 So.2d 400, 405 (1968):

"Although laws have been validly enacted to protect the legally incompetent from their own acts, some of the persons who disregard the most elementary forms of self-preservation are, unfortunately, not legal incompetents, but only fools; and

' * * * a fool must follow his natural bent