STATE OF HAWAII, Plaintiff-Appellee, *v.* JAMES E. COTTON, Defendant-Appellant.

NO. 5399

DECEMBER 3, 1973

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON and KOBAYASHI, JJ.

OPINION OF THE COURT BY LEVINSON, J.

On November 17, 1972, the defendant was arrested in Honolulu for operating his motorcycle without wearing a helmet, as required by HRS § 286-81 (1) (A). Against the defendant's vigorous constitutional objections, a district judge found him guilty of this offense and fined him in the amount of five dollars. We affirm.

The thrust of the defendant's main argument is that HRS § 286-81 (1) (A) constitutes a burdensome imposition by the State on his personal freedom without any corresponding benefit to society as a whole which would make that imposition constitutionally permissible. *Cf. State v. Kantner,* 53 Haw. 327, 339, 493 P.2d 306, 313 (1972), *cert. denied,* 409 U.S. 948 (1972) (Levinson, J., dissenting). To accept this

argument, of course, we would have to overrule our previous opinion upholding the State motorcycle helmet requirement, *State v. Lee*, 51 Haw. 516, 465 P.2d 573 (1970).

At the outset we note that the Federal Constitution does not require us to strike down HRS § 286-81 (1) (A). *Simon v. Sargent*, 346 F. Supp. 277 (D. Mass.), *aff'd mem.*, 409 U.S. 1020 (1972) (rejecting constitutional arguments attacking the Massachusetts motorcycle helmet law which were virtually identical to those made by the defendant in this case). Instead, the defendant would have us read the Hawaii Constitution[1] to afford him greater protection than that of the Federal Constitution against legislative infringement of his right to be let alone, and specifically, of his freedom to choose whether to assume the risks of helmetless motorcycle riding. *Cf. State v. Santiago*, 53 Haw. 254, 492 P.2d 657 (1971).

We accept now, as we did in *State v. Lee, supra,* the fundamental tenet that the relationship between the individual and the state leaves no room for regulations which have as their purpose and effect *solely* the protection of the individual from his own folly. But to say that a motorcycle helmet law has as its primary objective the protection of the wearer from head injuries is not to say that *ipso facto* it is unconstitutional. There may be significant *secondary* harms to society as a whole which it is the purpose of the statute to remedy and which, if realistic, bottom the statute in policies which are constitutionally acceptable.

A wide range of possible justifications for mandatory helmet laws have been articulated by courts and commentators. They include: (1) the "flying missile" theory, *i.e.*, helmets shield cyclists from foreign objects which might cause loss of control and consequent accidents with others, *see State v. Fetterly*, 254 Or. 47, 49-50, 456 P.2d 996-97 (1969); (2) the "public ward" theory, *i.e.*, helmet laws, by limiting the extent of motorcycle injuries, curtail public expenditures for

---

[1] The relevant State constitutional provisions are article I, section 2, guaranteeing the rights of "life, liberty and the pursuit of happiness," and article I, section 4, providing that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws."

emergency and hospital care for the cyclist and also minimize welfare costs resulting from the cyclist's post-accident inability to care for himself and his dependents, *see* Note, *Motorcycle Helmets and the Constitutionality of Self-Protective Legislation*, 30 OHIO STATE L.J. 355, 370-72 (1969); (3) the "modelling" theory, *i.e.*, the helmetless rider may cause others, and particularly children, to imitate his behavior without first making a conscious choice rejecting the arguably safer use of a helmet, *see* Kaplan, *The Role of Law in Drug Control*, 1971 DUKE L.J. 1065, 1067; and (4) the "broad social impact" theory, *i.e.*, motorcycle injuries resulting in serious injury or death are "so alarming, so widespread and of such grave dimension that [they] threaten[] the very fabric of society," *State v. Lee, supra* at 519, 465 P.2d at 576, and hence that the State may adopt measures such as mandatory helmet laws, reasonably aimed at protecting the social order. While the "flying missile" and "modelling" theories are arguable justifications for mandatory helmet laws, they are inherently implausible and hence highly disingenuous. We prefer to rest our analysis on the "public ward" and "broad social impact" theories, the elements of which present the only realistic justifications for the law in question.

Both theories maintain that though helmet laws are directed on a primary level toward protecting the individual from head injuries, on a secondary level they protect much broader social interests. Viewed without limit, of course, "secondary harm" arguments could justify an impermissibly wide range of governmental interference with private liberties. *See, e.g., State v. Lee, supra* at 524, 527, 465 P.2d at 578, 579-80 (Abe, J., dissenting). We agree with Professor Kaplan, however, that

> [m]erely because protecting the public from secondary harms could logically justify a vast range of governmental interferences with individual liberty, and merely because we could define secondary harms as including anything lessening the full development of an individual's perfection, this does not mean that such interference is always improper.

Kaplan, *supra* at 1070.

As in so many areas of the law, the problem of deciding when secondary harms are sufficiently great in magnitude to justify remedial legislation aimed at primary behavior is one of enlightened judicial line-drawing. We start the process in this case with the observation that statistical evidence at the legislature's command indicates that the rate of increase of highway accidents and fatalities, as compared with other kinds of accidents, is alarmingly high. *See, e.g.,* Note, *supra* at 357. Moreover, there is evidence that the extent of motorcycle accidents, and particularly head injuries resulting therefrom, is at least as alarming as the general trend. *See, e.g., Simon v. Sargent, supra* at 279. Finally, the appropriateness of mandatory helmet laws as a remedy for this situation is likewise statistically demonstrable. *See, e.g., State v. Lee, supra* at 519-20, 465 P.2d at 576.

With the great danger of primary harm to helmetless cyclists as well as the rationality of helmet wearing as a safeguard thus statistically supported,[2] the magnitude of secondary harms of the nature indicated above is sufficiently great to justify the law at issue in this case. In answer to the *reductio ad absurdum* argument of the dissent in this case with respect to the extent of governmental intrusions justifiable by secondary harm analysis, we refer to the statement in *Lee* that "this holding is limited to this case." 51 Haw. at 521, 465 P.2d at 577. Particularly, we note that a tool which has aided us significantly in drawing the line between the police power and individual freedom in this case is the well-established doctrine that in regulating the use of public highways, the state has always been afforded exceptionally

---

[2] The defendant would have us accept as definitive numerous recent studies indicating that motorcycles are as safe as cars and that helmets increase rather than decrease the range of hazards inherent in motorcycle riding. These studies were not introduced in evidence at trial and hence are not properly before us now. Even were we to take judicial notice of them, however, other studies alluded to in the body of this opinion arrive at diametrically opposite conclusions. It is not our function to weigh the relative merits of this data, but rather to determine whether "the legislature was unreasonable in linking protective headgear to safer motorcycling." Simon v. Sargent, *supra* at 279. We conclude that it was not. Compare REA v. New York, 336 U.S. 106 (1949).

broad discretion.[3] Certainly it is not beyond the permissible scope of legislation to mitigate by mandatory safety laws the tremendous economic and social costs occasioned by the extent of present-day highway carnage.

The foregoing analysis adequately answers the defendant's argument that HRS § 286-81 (1) (A) exceeds the police power of the State under Article I, sections 2 and 4 of the Hawaii Constitution. In response to his equal protection argument, we quote and adopt the reasoning of the three-judge federal district court in *Simon v. Sargent, supra* at 279:

> Finally, we see no merit in plaintiff's claim that the statute denies him the equal protection of the laws. It is not difficult to discern a rational basis for the legislature's distinction between motorcyclists and, for example, automobile drivers, whose vehicle affords them substantially more protection than does a motorcycle.

*See also McGowan v. Maryland,* 366 U.S. 420, 426 (1961).

We therefore decline to overrule *State v. Lee, supra,* and affirm the defendant's conviction.

*James E. Cotton,* defendant-appellant, pro se.

*Stephen Y. Lau,* Deputy Prosecuting Attorney *(Barry Chung,* Prosecuting Attorney, City & County of Honolulu, of counsel) for plaintiff-appellee.

---

[3] *See, e.g.,* Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 523, 524 (1959) ("The power of the State to regulate the use of its highways is broad and pervasive," and "safety measures [on our highways] carry a strong presumption of validity when challenged in court"); Southern Pac. Co. v. Arizona, 325 U.S. 761, 783 (1945) ("[Highway] regulation is akin to quarantine measures, game laws, and like local regulations of rivers, harbors, piers, and docks, with respect to which the State has exceptional scope for the exercise of its regulatory power") (dicta); REA v. New York, 336 U.S. 106, 109 (1949) (Regulation of traffic is "one of the most intensely local and specialized of all municipal problems").

DISSENTING OPINION OF ABE, J.,
WITH WHOM KOBAYASHI, J., JOINS

The majority of this court has upheld the constitutionality of the helmet requirement provision of HRS § 286-81 (1) (A)[1] and I respectfully dissent.

The defendant attacks the constitutionality of the portion of HRS § 286-81, requiring a motorcyclist to wear a helmet on the ground that the wearing of a protective helmet is only for an individual's own personal safety and, therefore, is not a reasonable exercise of the State's police power to protect public safety, health, or welfare.

The State, on the other hand, contends that the State has a vital interest in protecting "members of the community from injuring themselves" and that the headgear requirement is a valid exercise of its police power. The State also urges this court to adopt the reasoning in *Simon v. Sargent*, 346 F. Supp. 277, 279 (D. Mass., 1972); *aff'd mem.*, 409 U.S. 1020 (1972), where contentions similar to plaintiff's were rejected:

For while we agree with plaintiff that the act's only realistic purpose is the prevention of head injuries incurred in motorcycle mishaps, we cannot agree that the consequences of such injuries are limited to the individual who sustains the injury. In view of the evidence warranting a finding that motorcyclists are especially prone to serious head injuries, see Statistical Division, National Safety Council, 1971 Motorcycle Facts, the public has an interest in minimizing the resources directly involved. [Fn. omitted.] From the moment of the

---

[1] HRS § 286-81 (1) provides in pertinent part:

§ 286-81 *Motorcycle, motor scooter, etc.; protective devices*. No person shall:

(1) Operate a motorcycle or motor scooter on any highway in the State unless he and any passenger he carries on the motorcycle or motor scooter wears (A) a safety helmet securely fastened with a chin strap; (B) safety glasses, goggles, or a face shield, in the case of a motorcycle or motor scooter that is not equipped with windscreens or windshields; and (C) any other protective devices required by rules and regulations adopted by the state highway safety coordinator. For the purposes of meeting the requirements of this paragraph, a required device must meet the specifications and requirements established by rules and regulations adopted by the state highway safety coordinator.

injury, society picks the person up off the highway; delivers him to a municipal hospital and municipal doctors; provides him with unemployment compensation if, after recovery, he cannot replace his lost job, and, if the injury causes permanent disability, may assume the responsibility for his and his family's continued subsistence. We do not understand a state of mind that permits plaintiff to think that only he himself is concerned.

It is generally recognized that a state has inherent authority under its police power to enact reasonable laws to protect and preserve public order, safety, health and morals. *Nebbia v. New York,* 291 U.S. 502 (1934); *Borden Co. v. McCrory,* 169 F. Supp. 197 (E.D. La. 1959); *Pacific Meat Co. v. Otagaki,* 47 Haw. 652, 394 P.2d 618 (1964); *State v. Gordon,* 143 Conn. 698, 125 A.2d 477 (1956). However, it would be impossible for any court to provide a precise delineation of, or definition for, the scope of the police power.

On this difficult question the United States Supreme Court in *Goldblatt v. Hempstead,* 369 U.S. 590, 594 (1962) said:

The term "police power" connotes the time-tested conceptional limit of public encroachment upon private interests. Except for the substitution of the familiar standard of "reasonableness," this Court has generally refrained from announcing any specific criteria. The classic statement of the rule in *Lawton v. Steele,* 152 U.S. 133, 137 (1894), is still valid today:

"To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."

In *Shelton v. Tucker,* 364 U.S. 479, 488 (1960), the U.S. Supreme Court said:

In a series of decisions this Court has held that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means

that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

I agree with the State's contention that the State has a substantial interest in highway safety and that it has the power to control and regulate the use of highways. However, it does not necessarily follow that under such power, the State may constitutionally mandate the wearing of headgear under threat of criminal punishment.

The general rule as stated by this court in *Bishop v. Mahiko*, 35 Haw. 608, 641 (1940), is that:

The burden of showing that an Act of the legislature is unconstitutional is on the party asserting it. Every enactment of the legislature carries a presumption of constitutional validity and should be upheld by the courts unless it has been shown to be, beyond all reasonable doubt, in violation of the Constitution. Moreover, the facts adduced to show unconstitutionality must be clear and convincing and must show beyond question that the legislature exceeded the limits marked by the Constitution. [Footnoted citations omitted.]

However, a presumption of constitutionality cannot serve as a rationale for complete judicial abdication of responsibility for determining whether legislation meets the test adopted by the U. S. Supreme Court in *Goldblatt v. Hempstead, supra,* and *Shelton v. Tucker, supra*. Thus, it ˙ for this court to determine whether the object or purpose of the headgear requirement is to promote public safety and also whether it is unduly oppressive to individual freedom. *See also, American Motorcycle Association v. Davids,* 11 Mich. App. 351, 358, 158 N.W.2d 72, 76 (1968).

Comparing provisions (A) and (B) of HRS § 286-81 (1), I believe that the specific objective of the headgear requirement is to safeguard the person wearing it. It would appear that our legislature, fully recognizing the special hazards faced by all motorcyclists, and the folly exhibited by some motorcyclists, enacted the headgear provision to prevent death and injuries to cyclists resulting from motorcycle mishaps. I do not question the beneficent intent of the legislature in enacting the law to protect immature and

reckless, or careless, or foolhardy youngsters and adults, who are unwilling to protect themselves.[2]

I agree, as this court said in *State v. Lee*, 51 Haw. 516, 519, 465 P.2d 573, 575-76 (1970), that the basic issue on the helmet question is

> whether the legislature may constitutionally regulate the conduct of an individual so as to require him to protect himself from physical injury and or death; that is, whether physical harm to self is a proper subject of public interest and thus subject to the police power of the legislature.

Article I, Sec. 2 of our State Constitution[3] guarantees the right to the enjoyment of life, liberty, and the pursuit of happiness. Under this guarantee one has the constitutional right to be let alone. With this right to be let alone, one has the right to determine for himself what is for his "best interest," even though some scholars contend that there is ". . . a general decline in the belief that individuals know their own interests best, and . . . an increased awareness of a great range of factors which diminish the significance to be attached to an apparently free choice or . . . consent."[4]

Are we to accept the State's contention (and the reasoning of *Simon v. Sargent, supra*) that injuries to a single individual are a concern, not for himself alone but for the public in general, because of the State's interest in keeping its citizens healthy and productive and in preventing expenditures of public funds to aid persons injured by falls from motorcycles? I believe that our acceptance of the State's argument would open the door to constitutional justification for unlimited paternalism on the part of the State. As a corollary, our

---

[2] The defendant here questions the beneficent effect of the law and contends that *more* deaths in motorcycle mishaps are caused by the wearing of headgear. However, I reiterate that the wisdom or lack of wisdom in the enactment of the law is not for this court to decide.

[3] Article I, Sec. 2 of our State Constitution provides:

> All persons are free by nature and are equal in their inherent and inalienable rights. Among these rights are the enjoyment of life, liberty and the pursuit of happiness, and the acquiring and possessing of property. These rights cannot endure unless the people recognize their corresponding obligations and responsibilities.

[4] Hart, *Law, Liberty and Morality*, pp. 32-33, 1963 (reprinted 1965).

upholding of the headgear requirement under such reasoning could mean that the legislature might have virtually limitless power to curtail individual actions, even though such actions do not affect public safety, health or morals. For example, according to the State's argument, our legislature could, under threat of criminal punishment: prohibit the smoking of cigarettes or other tobacco products; regulate or restrict the consumption of fattening foods to prevent obesity; regulate and fix the daily hour for retiring and waking up; or otherwise regiment the lives of individuals by other regulations. I do not believe that people of Hawaii are ready to forfeit their individual liberty to a point where legislative discretion is to be the only practical bar to the determination of what one may or may not do under the doctrine of "best interest" of the individual.

I recognize that that intent of the law is beneficent; however, that should not be the determinative factor as to its constitutionality. As stated by Justice Louis Brandeis in his dissent in *Olmstead v. United States*, 277 U.S. 438, 478-79 (1928):

The makers of our Constitution * * * sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized man. * * *

Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.

Therefore, I cannot agree that the protection of an individual from himself is within the legitimate exercise of the police power; otherwise, there would be no restriction or limitation to this power, and the State could regulate an individual's life, his way of living, and even his way of thinking. The statute is not concerned with the preservation of public safety, health, order, morals, or welfare; and though

148

the headgear requirement may be beneficent, nevertheless, it is unconstitutional because it attempts to infringe upon and stifle the fundamental personal right of liberty, under which each individual may act as he sees fit to preserve his own safety if he does not harm others in doing so.

The fact that the general public may consider it foolhardy to ride a motorcycle without a safety helmet is alone insufficient basis or justification for defining the non-use of a helmet a criminal offense. I believe that our State Constitution affords one the privilege of making a fool of himself if he so desires, so long as his action does not bring significant harm to the general public.

I would, therefore, hold that HRS § 286-81 (1) (A), the provision requiring the wearing of a helmet, is not a reasonable exercise of the State's police power and violates Art. I, Sec. 2 of the Hawaii State Constitution, and I would overrule *State v. Lee*, 51 Haw. 516, 465 P.2d 573 (1970).